PITTA & DREIER LLP
499 Park Avenue
New York, NY 10022
(212) 652-3890
*Attorneys for Respondent*
*Peter Ward, as President of Local 6, Hotel, Restaurant*
*& Club Employees and Bartenders Union, UNITE-HERE*

Jane Lauer Barker (JB 5436)
Michael J. D'Angelo (MD 3030)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------X

THE PLAYERS,

                    Petitioner,

        -against-

PETER WARD, as President of LOCAL 6,
HOTEL, RESTAURANT & CLUB EMPLOYEES
AND BARTENDERS UNION, UNITE-HERE,

                    Respondent.

-------------------------------------X

**JUDGE CROTTY**

**08 CV 1079**

Case No. 07-Civ-

NOTICE OF REMOVAL



FEB 01 2008

U.S.D.C. S.D. N.Y.
CASHIERS

TO:    THE HONORABLE JUDGES OF THE UNITED STATES DISTRICT
       COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

       Respondent Peter Ward, as President of Local 6, Hotel, Restaurant & Club Employees

and Bartenders Union, UNITE-HERE ("Respondent" or "Union") by its attorneys, Pitta & Dreier

LLP, respectfully seeks the removal of this civil action and shows:

       1.    Petitioner The Players a/k/a The Players Club (hereinafter referred to as the

"Employer", "Club" or "Petitioner") brought this action in the New York State Supreme Court,

County of New York, by the filing of a Notice of Petition, dated January 29, 2008, and an

accompanying Verified Petition, dated January 29, 2008, (collectively the "Petition"), seeking to

{00324780.DOC;}

vacate a labor arbitration award issued by Arbitrator Ira Drogin on January 15, 2008 (the "Award"). Attached hereto as Exhibit A is a true and accurate copy of the Petition.

2.      This is a civil action over which this Court has original jurisdiction under 28 U.S.C. § 1331, Section 301 of the Labor Management Relations Act (the "LMRA"), 29 U.S.C. §185, and, therefore, may be removed to this Court pursuant to the provisions of 28 U.S.C. § 1441.

3.      Respondent removes this action because the Petitioner seeks to use the state courts as a vehicle to avoid its contractual obligations with the Union as well as to avoid its obligation to arbitrate certain disputes and be bound by the decisions and awards of the resulting arbitrations.

4.      The Petition purports to claim that the arbitrator exceeded his power and was partial in issuing the Award.  The arbitrator, however, after hearing evidence submitted by the Union and the Club, determined that the Petitioner was bound to and violated the terms of the parties' collective bargaining agreement and ordered the appropriate remedies available under the CBA and federal labor law. A true and accurate copy of the Award is attached hereto as Exhibit B. Moreover, any inquiry into Petitioner's allegations necessarily requires the Court to construe the terms of collective bargaining agreement, inextricably linking such claims to contract construction under federal labor law, 29 U.S.C. §185.

## THE PARTIES

5.      The Petitioner is a domestic not-for-profit corporation an "employer" in an industry affecting commerce as respectively defined by Sections 2(2) and (6) of the LMRA, 29 U.S.C. §§152(2) and (6). The Petitioner is private social club promoting social intercourse between members of the dramatic profession and the kindred professions of literature, painting,

architecture, sculpture and music, law and medicine, and the patrons of the arts and provides various other services to its members and is located at 16 Gramercy Park, New York, New York 10003.

6.    Employees of the Club work in defined job positions commonly represented by the Union.

7.    The Respondent is a "labor organization" as defined in Section 2(5) of the LMRA, 29 U.S.C. §152(5). The Union represents employees performing various trades in the New York City hotel, restaurant and hospitality industry, an industry affecting "commerce" as defined in Section 2(6) of the LMRA, 29 U.S.C. §152(6). At all relevant times, the Union has represented employees employed by the Club in various defined job positions as their collective bargaining representative pursuant to the provisions of the LMRA.

## THE PARTIES' COLLECTIVE BARGAINING AGREEMENT AND THE CLUB'S UNLAWFUL SUBCONTRACTING OF BARGAINING UNIT WORK

8.    The Union and Club have been parties to a series of collective bargaining agreements since at least February 1, 1989 (the "CBA"), with the most recent agreement known as a Memorandum of Agreement dated June 7, 2007 ("MOA"). Attached hereto as Exhibit C are true and accurate copies of the CBA and MOA.  Pursuant to Schedule "A" of the CBA, bargaining unit work at the Club consisted of all food and beverage service (Chef, Sauce Cook, Cook, Pot Washer, Dish Washer, Waiters (full and part time), Captains, Head Bartender and Bartenders) as well as Housemen, Nightwatchmen, and a Coatroom attendant.

9.    The CBA and MOA contain the following broad arbitration clause:

> "In the event of any dispute or controversy of any nature whatsoever between the parties or with reference to the interpretation or application of this Agreement, the matter,

question or dispute, shall be referred to a rotating panel of four (4) arbitrators, two (2) to be selected by the Union and two (2) by the Employer. The Union has selected arbitrators Ira Drogin and Elliot Shriftman, with the Employer selecting the remaining two (2). The decision of the arbitrator shall be final and binding in the parties hereto."

10.     On or about July 27, 2007, merely six (6) weeks after entering into the MOA with the Union, the Club entered into an agreement with Elegant Affairs, NY, Inc. (the "Elegant Agreement"). The Elegant Agreement provides that effective August 1, 2007, Elegant would be the Club's exclusive food and beverage provider for the Club. As the exclusive food and beverage provider, Elegant Affairs would service all food and beverage needs of the Club and its members, including lunches, brunches, and dinners as well as servicing bar operations. Moreover, Elegant would conduct both social and business/corporate catered affairs, parties, celebrations, fundraisers and similar events for the Club, its members and for the general public. As a result of entering into the Elegant Agreement, on or about August 13, 2007, the Club discharged all of its food and beverage service employees represented by the Union, effective August 9, 2007. At no time after the MOA was executed did the Club bargain to impasse the issue of subcontracting the food and beverage operation to Elegant with the Union. Instead, the Club acted unilaterally and in contravention of the CBA.

11.     As a result of the Club's aforementioned actions, the Union demanded arbitration in accordance with the CBA and MOA, seeking among other things, an award finding that the Club violated the CBA by subcontracting the food and beverage service and failed and refused to negotiate in good faith to impasse with the Union concerning a mandatory subject of bargaining, i.e., the subcontracting of food and beverage service. Arbitration was held on October 30, 2007 and November 26, 2007 with the Award being issued on January 15, 2008.

## THE COURT'S REMOVAL JURISDICTION

12.    Title 28 of the United States Code, Sections 1441(a) and (b) provides the basis for removal jurisdiction in this action.

13.    The state court action herein is within the original jurisdiction of the Court "founded on a claim or right arising under the... laws of the United States." Section 301(a) of the LMRA, 29 U.S.C. § 185 provides:

> a. Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act... may be brought in any district court of the United States having jurisdiction of the parties without respect to the amount in controversy or without regard to the citizenship of the parties.

14.    It is well settled in this Circuit that federal courts have jurisdiction under Section 301(a) of the LMRA over petitions regarding labor arbitration awards, see, New York Health and Human Service Union, 1199/SEIU v. NYU Hospital Center, 343 F.3d117 (2nd Cir. 2003); Hotel & Restaurant Employees Union, Local 217 v. J.P. Morgan Hotel, 996 F.2d 561 (2nd Cir. 1993).

15.    This Court has federal question jurisdiction over the instant action based on the afore-cited federal statutes and authorities.

16.    This notice of removal is timely filed under 28 U.S.C. §1446(b) in that it is filed within thirty (30) days of receipt of the Petition.

17.    A copy of this Notice of Removal with exhibits will be filed with the Clerk of the Supreme Court of the State of New York, County of New York, and served on the Petitioner in accordance with 28 U.S.C. §1446(d).

WHEREFORE, the Union prays this action be removed to this Court from the Supreme

Court of the State of New York, County of New York.

Dated: New York, New York
       February 1, 2008

                              Respectfully submitted,

                              PITTA & DREIER LLP
                              *Attorneys for Respondent*
                              *Peter Ward, as President of Local 6, Hotel, Restaurant*
                              *& Club Employees and Bartenders Union, UNITE-HERE*

                              By:  _____

                                   Jane Lauer Barker (JB 5436)
                                   Michael J. D'Angelo (MD 3030)
                              499 Park Avenue
                              New York, New York 10022
                              (212) 652-3890

Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------- X
THE PLAYERS,

                              Plaintiff,                    Index No. 08  101761

          -against-                                         **NOTICE OF**
                                                            **PETITION**
PETER WARD, as president of LOCAL 6, HOTEL
RESTAURANT & CLUBEMPLOYEES AND
BARTENDERS UNION, UNITE-HERE,

                              Defendants.
-------------------------------------------------------------------- X

PLEASE TAKE NOTICE, that upon the petition of The Players, verified on the 29th Day

of January, 2008, an application will be made to a ~~Term, Part~~ Room 130 ____ of this court to be held at the

courthouse thereof, located at 60 Centre Street, New York, New York, on the 26th day of

February, 2008, at 9:30 o'clock in the forenoon of that day, or as soon thereafter as counsel can

be heard, for a judgment granting the relief prayed for in the petition, and for such other and

further relief as may be just, proper, and equitable.

PLEASE TAKE FURTHER NOTICE, that a demand is hereby made for the service of an

answer and supporting affidavits, if any, at least seven days before the aforesaid date of hearing,

since this notice is served at least twelve days before such time.

Petitioner designates New York County as place of trial. The basis of venue is the county

in which Respondent is doing business, at 709 8th Avenue, New York, New York.

Dated:        Woodbury, New York
              January 29, 2008

                                              Respectfully submitted,

NEW YORK
COUNTY CLERKS OFFICE

Jan 30 2008

NOT COMPARED
WITH COPY FILE
                                              Regina E. Faul
                                              KAUFMAN DOLOWICH & VOLUCK LLP
                                              135 Crossways Park Drive Suite 201
                                              Woodbury, NY 11797
ND: 4841-2506-7522, v. 1                      (516) 681-1100

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------ X
THE PLAYERS,

|  |  |
|---|---|
| Plaintiff, | Index No. |
| -against- | **VERIFIED PETITION** |

PETER WARD, as president of LOCAL 6, HOTEL
RESTAURANT & CLUBEMPLOYEES AND
BARTENDERS UNION, UNITE-HERE,

                                        Defendants.
------------------------------------------------------------------ X

Petitioners, THE PLAYERS, by their attorneys KAUFMAN DOLOWICH &

VOLUCK LLP, complaining of Respondent, respectfully allege as follows.

## JURISDICTION AND VENUE

1.      Upon information and belief, Respondent maintains a principal place of

business and does business at 709 8th Avenue, New York, NY 10036, in the County of

New York, State of New York.  Upon information and belief, the President of Local 6,

Hotel Restaurant & Club Employees and Bartenders Union, Unite-Here, a labor

organization, is Peter Ward.

2.      Upon information and belief, based on the county in which Respondent

does business, venue is properly placed in the Supreme Court in the County of New York

pursuant to CPLR 7502(a)(i).

3.      This is an action to vacate an arbitration award pursuant to CPLR 7511.

This court has jurisdiction over this matter pursuant to CPLR 7502(a).

## FACTS

4.      Petitioners The Players ("the Players") and Respondent Local 6, Hotel

Restaurant & Club Employees and Bartenders Union, Unite-Here, ("the Union") are

parties to a collective bargaining agreement ("CBA"). A true and complete copy of the most recent Memorandum of Agreement and other relevant agreements between the parties are attached hereto as Exhibit A.

5.    Article 7 in the Memorandum of Agreement entered into on June 7, 2007 provides, "In the event of any dispute or controversy of any nature whatsoever between the parties or with reference to the interpretation or application of this Agreement, the matter, question or dispute, shall be referred to a rotating panel of four (4) arbitrators, two (2) to be selected by the Union and two (2) by the Employer. The Union has selected arbitrators Ira Drogan and Elliot Shiftman, with the Employer selecting the remaining two (2)."

6.    The Players and the Union submitted a dispute under the Memorandum of Agreement to arbitration before Arbitrator Ira Drogin ("Arbitrator Drogan"). This dispute involved the contracting out of the Players' food and beverage service to Elegant Affairs NY, Inc. ("EANY").

7.    This arbitration involved the following facts: The Players are signatory to a collective bargaining agreement with the Union covering bargaining unit employees. In July 2007, after negotiations, the parties entered into a Memorandum of Agreement for a successor agreement. The previous agreements date back to 1989 through 2001.

The Players discontinued providing food and beverage service in August, 2007. Historically, the Players are closed for the period August 1 through Labor Day. Upon its reopening in 2007, food and beverage service has been provided by EANY. The Players and EANY entered into an agreement ("Agreement") by which EANY obtained the rights to provide catering services at the Players for meals and catered events. The Agreement states that EANY is responsible for staffing and that all employees serving food and

beverages are employees of EANY.  Months prior to the cessation of services and any

agreement with EANY, the Players advised the Union of its intent to discontinue services

and enter an agreement with EANY.  Additionally, EANY and the Players and entered

into previous contractual arrangements predating the Agreement whereby EANY

provided banquet services to the Players.  The Union was well aware of the Players

relationship with EANY.

8.     At the October 30th and November 26th, 2007 arbitration hearings, the

Players and the Union submitted the following questions to the arbitrator:  "Whether the

Players subcontracted bargaining unit work and if so, were the Players required to

negotiate over subcontracting?  If so, what shall the remedy be?" and "If the Players

subcontracted work and it is found that the Players had the right to subcontract work,

have the Players complied with the provisions of the agreement?  If not, have the Players

negotiated in good faith as to the effects of the decision?  If not, what shall the remedy

be?"

9.     On January 15, 2008, Arbitrator Drogan issued an award related to the

October 30, 2007 and November 26, 2007 hearings.  A true and accurate copy of this

award is attached hereto as Exhibit B.

10.    At arbitration, the Players argued that notice was provided to the Union

months prior to the contracting of food and beverage service to EANY and that the Union

did not request bargaining over this decision.  This pivotal threshold issue was critical to

the Players' argument, as such notice discharged the Players' duties under Section 8(d) of

the National Labor Relations Act ("Act") which requires that a party to a collective

bargaining agreement provide notice to the other party prior to making a midterm

modification to the existing agreement between the parties.  Because the Players

complied with the notice provisions of 8(d) and the Union did not request bargaining, the Union waived their right to bargain over the Players' decision to contract out food and beverage services to EANY.

11.    During the arbitration, the Union offered no sworn testimony or any other form of evidence whatsoever to dispute the Players' assertion that the Union did not receive notice of their intent to contract out the food and beverage service to EANY.

12.    Nevertheless, in his award, Arbitrator Drogan found that "there were no proposals by either side dealing with the subject of subcontracting and I find that there was no discussion of subcontracting..." prior to the Players' contracting of services to EANY.

13.    Arbitrator Drogan exceed his power and engaged in misconduct, partiality or, at the very least, exceeded the bounds of rationality, in making an unsupported evidentiary determination that significantly prejudiced the Players. Such an unsupported conclusion is clear and convincing evidence of misconduct, partiality, or at the very least, irrationality sufficient to warrant the vacation of the arbitration award.

14.    Further Arbitrator Drogan's award directs "the Club to immediately cease and desist from subcontracting its Food and Beverage service to Elegant Affairs, and to cease and desist from allowing Elegant Affairs to conduct any Food and Beverage operations at the Players with employees of Elegant Affairs."

15.    As such, Arbitrator Drogan's award directs the Players to breach a bargained for contract entered into between the Players and EANY.

16.    Strong public policy, grounded in decisional law, favors judicial protection of contracts freely entered into. Because Arbitrator Drogan's award directs the Players to breach to their contract with EANY, disregarding the bargained for exchange

of the parties and causing substantial economic loss to flow therefrom, the award must be vacated on public policy grounds.

17.     Finally, Arbitrator Drogan's award does not indicate a deadline by which the Players must terminate its contract with EANY.

18.     Because the award leaves the Players unable to determine their rights and obligations with respect to a deadline for terminating its relationship with EANY, the award does not resolve the controversy, but rather creates a new controversy with regard to the Players' timetable for compliance.

19.     Therefore, the award of Arbitrator Drogan must be vacated.

20.     No previous application for the relief herein prayed for has been made.

WHEREFORE, Petitioners respectfully pray that the Court vacate the arbitration award, deny any rehearing or redetermination of the issue to an arbitrator, and grant such other relief as the Court deems just and proper including, but not limited to, reasonable attorneys' fees and costs.

Dated:       Woodbury, New York
             January 29, 2008

                                    Respectfully submitted,

                                    Regina E. Faul
                                    KAUFMAN DOLOWICH & VOLUCK LLP
                                    135 Crossways Park Drive Suite 201
                                    Woodbury, NY 11797
                                    (516) 681-1100

To:     Local 6 Hotel Restaurant & Club Employees
        And Bartenders Union, Unite-Here
        709 8th Avenue
        New York, NY 10036

# **VERIFICATION**

STATE OF NEW YORK    )
                      )    SS:
COUNTY OF NASSAU    )

I, Regina E. Faul, hereby affirm that I am an attorney duly admitted to practice before the courts of the State of New York and am a partner with the law firm of Kaufman Dolowich & Voluck LLP with offices in the County of Nassau, State of New York; Kaufman Dolowich & Voluck LLP represents the Petitioner The Players in this matter; the foregoing verified Petition is true to my knowledge, except as to matters therein stated upon information and belief and as to those matters I believe to be true; that the grounds of my belief as to all matters not stated upon my knowledge are based on correspondence and other writings furnished to me by the Petitioners and interviews with the Petitioners, and that the reason why a verification is not made by the Petitioners is that the Petitioners are located in a county other than the County of Nassau, in which the offices of Kaufman Dolowich & Voluck are located.

Dated:        Woodbury, New York
                January 29, 2008

Respectfully submitted,

Regina E. Faul
KAUFMAN DOLOWICH & VOLUCK LLP
135 Crossways Park Drive Suite 201
Woodbury, NY 11797
(516) 681-1100

ND: 4831-1227-3922, v. 1

Exhibit A

Serial #

41

Players Club
CBA
Effective 5/1/89
Expires 4/30/92

COLLECTIVE BARGAINING AGREEMENT made and entered

into as of the 1st day of February, 1986, ~~1986~~ 89, by and between THE

PLAYERS, located at No. 16 Gramercy Park, Borough of

Manhattan, City and State of New York (hereinafter referred

to as the "Employer") and the HOTEL, RESTAURANT & CLUB

EMPLOYEES AND BARTENDERS UNION, LOCAL NO. 6, affiliated with

the Hotel and Restaurant Employees and Bartenders Inter-

national Union, and the American Federation of Labor, located

at No. 305 West 44th Street, Borough of Manhattan, City and

State of New York (hereinafter referred to as the "Union").


W I T N E S S E T H :

WHEREAS, the Employer maintains and operates a

private membership Club; and


WHEREAS, the Union has been duly designated as the

sole collective bargaining agent by the employees of the

Employer; and


WHEREAS, the Employer and the Union recognize this

status and desire to cooperate to stabilize labor relations

by establishing the standards of wages, hours of service and

other conditions of employment, and providing arbitration

machinery, whereby disputes and grievances between the
Employer and the employees may be adjusted without resort to
strikes, lockouts or other interferences with the continued
operation of the business of the Employer.

THEREFORE, the parties mutually agree as follows:

### I.   SCOPE OF AGREEMENT

The terms of this Agreement shall apply solely to
the classification of employees of the Employer for whom the
Union has been designated as the collective bargaining agent,
as aforesaid, and the term "employee", as used in this
Agreement, shall likewise apply only to those persons
employed by the Employer for whom the Union has been so
designated.  The aforesaid classification of employees are
set forth in Schedule "A" annexed hereto and made a part
hereof.

### II.   UNION RECOGNITION

The Employer recognizes the Union as the sole
collective bargaining agent for the classifications of
employees set forth in Schedule "A".

### III.   EMPLOYMENT

(a)  The Employer shall apply to the Union to
supply it with new employees.  If the Union cannot supply the

required employees within forty-eight (48) hours after the Employer has advised the Union to supply such a candidate for employment, the Employer shall have the right to engage such help in the open market.

(b) The Union undertakes to supply qualified and competent employees for such vacancies as it may be required to fill. All new employees shall be engaged for a trial period of up to thirty (30) days. This trial period is to give the Employer an opportunity to judge the competency of the new employee. During this trial period, the Employer shall have the right to discharge the employee for any reason whatsoever. Upon the expiration of the said trial period, the candidate shall be considered a regular employee and come within the terms and provisions of this Agreement.

(c) Newly engaged employees who are not members of the Union shall become members of the Union no later than sixty (60) days after the date of this Agreement or sixty (60) days after the date of their employment by the Employer, whichever is later, as a condition of employment. The Union agrees to permit such newly engaged employees, not members of the Union to become members of the Union unless for good cause shown to the Employer, which shall be subject to arbitration if the Employer challenges said cause.

(d) All employees who are members of the Union at the execution date of this Agreement and all employees who

-3-

shall thereafter join the Union during this contract period,
shall remain members of the Union, as a condition of
employment. Nonmembers of the Union employed prior to
January 1, 1946, shall not be required to join the Union.

### IV.    TERMINATION OF EMPLOYMENT

(a)    Discharge may be made only for just cause.
The Employer shall have the right without notice to the Union
to summarily discharge any employee for dishonesty, drinking,
physical fighting on the premises or leaving work without
punching out or first obtaining the permission of the
Employer. The Employer shall notify the Union of its desire
to discharge any employee for any just cause other than those
stipulated above. If the Union desires to challenge such
discharge, the matter shall be referred to arbitration in the
manner hereinafter provided. Should the Union also desire to
challenge any discharge summarily made on the grounds above
stipulated, that matter shall likewise be submitted to
arbitration in the manner hereinafter provided. It is
understood that membership in or activities on behalf of the
Union shall not be grounds for discharge.

(b)    Nothing herein contained shall be construed to
limit the Employer's right to reduce the number of employees
in any classification when warranted by business conditions.
In the event that the Union prefers to invoke a share-the-

work plan instead of effecting any layoffs, the Employer
agrees to work out such arrangement, provided it shall mean
no extra expense to the Employer, and shall not cause any
hardship on the Employer.

### V.   COMPENSATION, HOURS AND DAYS OF WORK, OVERTIME AND MEALS

(a)   Full-time employees shall work a five (5) day,
thirty-five (35) hour work week, and the work day for said
employees shall be seven (7) hours per day.   Part-time
employees shall work a five (5) day, seventeen and one-half
(17-1/2) hour work week.   The work day for part-time
employees shall be three and one-half (3-1/2) hours per day.
Employees presently working less than the foregoing hours
shall continue to do so.   All work done by employees in
excess of the foregoing work week or work day shall be paid
for at overtime rate.

(b)   All employees shall receive meals without
cost.

(c)   (i)   Effective as of and retroactive to the
1st day of May, 1989, all full-time employees shall receive a
wage increase of Nineteen Dollars ($19) per week.   Effective
May 1, 1990, said employees shall receive an additional wage
increase of Twenty Dollars ($20) per week.   Effective May 1,
1991, said employees shall receive a further wage increase of
Twenty-One Dollars ($21) per week.

-5-

(ii)  Effective as of and retroactive to the
1st day of May, 1989, all part-time employees shall receive a
wage increase of Nine Dollars and Fifty Cents ($9.50) per
week.  Effective May 1, 1990, said employees shall receive an
additional wage increase of Ten Dollars ($10.00) per week.
Effective May 1, 1991, said employees shall receive a further
wage increase of Ten Dollars and Fifty Cents ($10.50) per
week.

(d)  Annexed hereto and made a part hereof is
Schedule "A", which contains the minimum wages to be paid to
the employees for the duration of this Agreement.  New
employees for the first forty-five (45) working days of their
employment shall be paid no less than the wage applicable for
the immediately preceding contract year.

### VI.  VACATIONS

(a)  All employees employed by the Employer six (6)
months but less than one (1) year, shall receive 6 days
vacation with pay.  All employees employed by the Employer
one (1) year but less than six (6) years, shall receive
eleven (11) days vacation with pay.  All employees employed
by the Employer six (6) years but less than fourteen (14)
years,  shall receive sixteen (16) days vacation with pay.
All employees employed by the Employer fourteen (14) years
but less than twenty-five (25) years shall receive twenty-one

(21) days vacation with pay.  All employees employed by the Employer twenty-five (25) years or more shall receive twenty-five days vacation with pay.

An allowance for meals to the extent of Fifty Cents ($.50) per day shall be added to the vacations herein provided for the vacation period.

(b)  The employer agrees to effect a rotation of employees during the summer months so as to provide an extra day off without deduction of pay, provided such rotation would not interfere with the normal business of the Club.

An employee whose employment is terminated for any reason shall be paid a prorated vacation based upon the anniversary date of employment.

VII.  HOLIDAYS

Employees shall be paid a double day's pay for a full day's work, or pro rata, for work performed on the following twelve (12) legal holidays:

| | |
|---|---|
| (Memorial) Decoration Day | Labor Day |
| Thanksgiving | Columbus Day |
| Friday after Thanksgiving | Good Friday |
| Christmas | Lincoln's Birthday |
| New Year's Day (January 1) | Washington's Birthday |
| July 4th | Martin Luthur King Day |

and two (2) Personal Days or, at the option of the Employer, a day off may be given in lieu of the double day's pay.

VIII.  SHOP CHAIRMAN

The employees shall be entitled to elect a Shop
Chairman who shall be recognized by the Employer.  All
grievances and complaints of the workers shall be referred to
this Chairman so that they may be presented in an orderly and
regular manner to the Manager of the Club, or his designated
representative.  In the event the Shop Chairman and the
Manager cannot adjust any matter, then in that event, the
Manager shall be required to discuss the same with the Union
officials.  In the event that the matter cannot then be
amicably adjusted, it shall be submitted to arbitration, as
hereinafter provided.  The Employer consents that the Shop
Chairman shall be permitted to inquire of all Union members
as to their good standing in the Union, including question of
Union dues and assessments.

IX.  OFFICIAL VISITS

At any reasonable time, an officer, representative,
delegate or a committee of the Union, bearing proper
credentials, shall have the right to visit the Employer's
place of business.  It is agreed, however, that these visits
shall in no manner interfere with the normal administration
of the business of the Employer.

## X.  REPLACEMENTS

All new employees shall be hired at the rate of pay for the classification in which such employee falls as set forth in Schedule "A" annexed hereto.

## XI.  UNION ACTIVITY

Employees shall not conduct Union activities during working hours.

## XII.  UNIFORMS AND LAUNDRY

The Employer agrees that it will furnish, launder and maintain without charge to the employees, all wearing apparel and uniforms required by it of the employees.  The cook's uniform shall consist of a jacket, trousers, apron and cap.

## XIII.  TERMINATION PAY

Upon termination of the employment of any employee covered by this Agreement for any reason whatsoever, the employee shall be entitled to termination pay in the following amounts:  Any employee covered by the Agreement who is permanently laid off after having been in the employ of the Employer for two (2) years or more, shall be paid one (1) week's severance pay for each year of employment.

XIV.   GROUP INSURANCE

The parties have established and shall continue to effect a group life, health and accident social security plan.  This plan provides for:

(a)    1.   A life insurance policy for each employee in the face sum of Two Thousand Five Hundred Dollars ($2,500.00), effective May 1, 1990.  Said policy shall be increased, as of May 1, 1991, in face value to Five Thousand Dollars (5,000.00).

2.   In the event that after twenty (20) years' service with the Employer an employee retires at age sixty-two (62) or later, the Employer agrees to maintain life insurance in the amount of Two Thousand Five Hundred Dollars ($2,500.00) for such employee for the remainder of his life.

(b)   A weekly benefit for sickness or disability resulting from non-occupational accidents starting with the eighth day and continuing for twenty-six (26) consecutive weeks.  This benefit shall be in the amount of one-half (1/2) the employee's average weekly wage with a minimum of Twenty Dollars ($20.00) per week, except that if an employee's average weekly wage is less than Twenty Dollars ($20.00) a week, said employee shall receive as a weekly benefit the employee's weekly wage.

(c)   All employees covered by this Agreement shall be provided Blue Cross hospitalization for the employee and

-10-

for the immediate members of his or her family.  Said Blue

Cross coverage shall be for one hundred twenty (12) full

benefit days and shall be paid for by the Employer.

(d)  The Employer shall contribute to the Hotel and

Club Employees' Union, Local 6 Insurance Fund on behalf of

each of the employees covered by this Agreement sufficient

money to enable said Insurance Fund to purchase Health

Insurance Plan of Greater New York (H.I.P.) or Group Health

Insurance (G.H.I.) coverage for each such employee and the

immediate members of his or her family.

The Employer agrees to be a party to and bound by

the Amended Agreement and Declaration of Trust establishing

the Hotel and Club Employees Union Local No. 6 Insurance Fund

entered into by the Union and other Employers as of January

26, 1962.  The Employer agrees that the benefits payable to

its employees thereunder shall be paid in accordance with the

Rules and Regulations promulgated by the Trustees of said

Fund.

(e)  The H.I.P. and the Blue Cross hospitalization

provided for each employee pursuant to subdivisions (c) and

(d) of this Article shall be in addition to the benefits

presently being received by employees in the form of sick or

disability benefits, hospitalization, insurance benefits and

the like, provided, however, that the Employer may, in its

discretion, withdraw from said employees any such benefits

-11-

which are duplicated by H.I.P. and Blue Cross hospitali-
zation.

The Employer agrees to pay to its employees
receiving either disability benefits or Workmen's Compen-
sation Benefits the difference between the employees' basic
wages under this Agreement and the compensation received by
the employees under the Disability Benefits Law or the
Workmen's Compensation Law, as the case may be, for a period
up to twenty-six (26) weeks.

(f)  Scholarship Fund

(i)  Effective May 1, 1990, the Employer
agrees to accept and become a party to an Agreement and
Declaration of Trust, which Agreement shall provide for the
establishment of a jointly-trusteed fund, the purpose of
which is to provide college scholarships to dependents of the
Employer's employees, the selection of which shall be made by
an independent committee of educators.

(ii)  Effective May 1, 1990, the Employer
shall contribute, monthly for the duration of this Agreement,
One ($1.00) Dollar per employee.  Said contribution shall be
remitted on or before the 13th day of each month.

(g)  The Employer further agrees to be bound by any
amendment to the Trust Indenture which the Trustees, in their
sole discretion, may pass authorizing the merger and/or
common administration of the Club Employees Insurance Funds

with the New York Hotel & Motel Trades Council and Hotel
Association of New York City Inc. Benefit Funds.

### XV.  PENSIONS

(a)  The Employer is a party to the Agreement and
Declaration of Trust of the Club Employees Pension Fund dated
the 28th day of October, 1955, and any amendments thereto.

(b)  The Employer shall contribute, as of May 1,
1989, monthly a sum equal to six and one-half per cent (6-
1/2%) of the gross wages of the employees covered by this
Agreement.  The said contributions shall be remitted on or
before the 10th day of each month to the Club Employees
Pension Fund.

(c)  The Trustees of the Club Employees Pension
Fund shall have the right to request records from the
Employer with respect to wages ad employment, and shall have
the right to examine said wage and employment records through
duly authorized representatives,, including certified public
accountants.

(d)  The Union in its name, or the Club Employees
Pension Fund, may institute an action or intervene in any
proceedings at law, equity or bankruptcy, for the purpose of
collecting any sums due to the Pension Fund.

(e)   The Employer further agrees to be bound by any amendment to the Trust Indenture which the Trustees, in their sole discretion, may pass authorizing the merger and/or common administration of the Club Employees Pension Fund with the New York Hotel & Motel Trades Council and Hotel Association of New York City, Inc. Pension Fund.

XVI.   DENTAL BENEFITS

(a)   The employer is a party to the agreement and Declaration of Trust, establishing a Dental Fund under the Local 6 Insurance Fund.

(b)   The Employer shall continue to contribute monthly for the duration of this agreement, a sum equal to two per cent (2%) of the gross wages of the employees covered by this agreement.   The said contributions shall be remitted to the Local 6 Insurance Fund on or before the 10th day of each month.

(c)   The Trustees of Local 6 Insurance Fund shall have the right to request records from the Employer with respect to wages ad employment, and shall have the right to examine said wage and employment records through duly authorized representatives, including certified public accountants.

(d)   The Union in its name, or the Fund, may institute an action or intervene in any proceedings at law,

equity or bankruptcy, for the purpose of collecting any sums
due to the Pension Fund.

### XVII.  SICK LEAVE

(a)  Each employee is entitled to a maximum sick
leave of six (6) days per calendar year, which shall accrue
at the rate of one-half (1/2) day per full month of
employment.

(b)  No sick leave shall be granted to an employee
unless he has completed the required probationary period; on
the understanding that upon completion of the probationary
period, each employee shall be entitled to retroactive credit
for sick leave.

(c)  Sick leave may be used only for absences due
to actual illness of the employee.  Notification of absence
due to illness should be made by the employee on each
scheduled work day as early as possible (i.e., within the
first two hours of the working day; i.e., between 8:00 a.m.
and 10:00 a.m.) to the Employer's manager or if the manager
is not available, then to the Employer's switchboard.  If the
employee is able to ascertain that the illness will exceed
one day at the time that he or she communicates with the
Employer, he or she should notify the Employer as to the full
extent of such anticipated absence.

(d)  Employees may be asked to submit a medical certificate or other similar evidence to substantiate the fact of illness after (i) two or more consecutive days of absences, or (ii) in cases where an employee has excessive absence, or a pattern of absences, or (iii) to substantiate the event of illness on the first regular work day before or after a holiday.

(e)  On or Before January 15 of each calendar year during which this Agreement is in effect, the Employer shall pay to each employee, at his or her regular rate of pay in effect on February 1 of the preceding contract year, an amount equal to one (1) day's pay for each unused day of sick leave accrued during the preceding calendar year so long as the employee was on the Employer's payroll on December 31 of the previous calendar year.

XVIII.  PREVAILING BENEFITS

Nothing herein contained shall be so construed as to deprive the employees of receiving benefits that have heretofore been granted to the employees.

XIX.  SENIORITY PRINCIPLE AND LEAVES OF ABSENCE

(a)  The seniority principle with respect to promotions, layoffs and all other aspects of the employment relationship shall be followed whenever practicable.  In the event that the employee to be laid off according to seniority

-16-

principles is necessary for the Employer's business, the Union will not insist on the seniority principle being applied.

(b)   The Shop Chairman and the Assistant Shop Chairman (who will be chosen by the Shop Chairman) shall enjoy top seniority in their job classifications for purposes of lay-offs so as to insure continuous representation of the unit.

(c)   The Employer agrees that any employee who has been in its employ for five (5) or more years, shall be entitled upon the request of said employee, to a three (3) months' leave of absence which shall be granted within a reasonable time after the request is made.  The exercise of this right to a leave of absence by any employee shall in no way impair any seniority rights which said employee had at the time of taking such leave.

## XX.   STRIKES AND LOCKOUTS

During the term of this Agreement, there shall be no strikes, stoppages, slowdowns or other forms of cessation of normal work on the part of the employees and the Union, and no lockouts on the part of the Employer.

## XXI.   SYMPATHY STRIKES

Notwithstanding any other provision which may be contained in this Agreement to the contrary, it is expressly

understood and agreed that in the event of any dispute or controversy involving the Employer and any other organization concerning the employment of other help or the handling, sale or distribution of merchandise in the establishment of the Employer, the Union reserves the right to withdraw its members from work, and such withdrawal shall not be deemed a breach of this agreement.

## XXII.   ARBITRATION

In the vent of any dispute or controversy of any nature whatsoever between the parties or with reference to the interpretation or application of this Agreement, the matter, question or dispute shall be referred to an arbitrator to be designated by the New York State Board of Mediation, pursuant to its rules and regulations.  The decision of the arbitrator shall be final and binding on the parties hereto.

## XXIII.   JURY DUTY

Any employee who serves on a jury shall be reimbursed by the Employer during the first two (2) weeks of such jury service for the difference between his (her) wages and jury pay.

## XXIV.   COLLECTION OF UNION DUES

The Employer agrees to deduct initiation fees, dues and assessments duly established by the By-Laws and Rules of the Union from the wages of the respective employees monthly. The Union agrees to furnish the Employer with a memorandum showing the amount of initiation fees, dues and assessments, due from its employees as members of the Union.  The Employer agrees, after such deductions, to transmit such sums collected by it to the Union not later than the fifth (5th) day of the month following the month of collection.  The Employer agrees to furnish to the Union a list of the employees in its establishment covered by the Agreement and to supplement such list from time to time to indicate the names of all new employees.  The Employer will also notify the Union of employees who have left the employ of the Employer.

## XXV.   SUCCESSOR CLAUSE

This Agreement shall be binding upon the successors and assigns of the parties hereto, and no provision, terms or obligations herein contained shall be affected, modified, altered or changed in any respect whatsoever by the consolidation, merger, sale, transfer or assignment or either party hereto or affected, modified, altered or changed in any

respect whatsoever by any change of any kind in the legal status, ownership or management of either party hereto.

### XXVI.  PRIVATE FUNCTIONS

The parties agree that the wages paid to employees working private functions shall be increased according to the "Players Club Banquet Agreement"  (Schedule "B" attached).

### XXVII.  DURATION

(a)  This Agreement shall be effective as of the 1st day of May 1989, and shall continue in full force and effect until the 30th day of April, 1992.

(b)  Thirty (30) days prior to the said expiration date, the Employer and the Union shall confer in order to commence negotiation for the terms and conditions of employment for the next succeeding contract period.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals the day and year first above written.

THE PLAYERS

By: _____

HOTEL, RESTAURANT & CLUB EMPLOYEES
AND BARTENDERS UNION, LOCAL NO. 6

By: _____

By: _____

By: _____

## SCHEDULE "A"

| | May 1, 1989 | May 1, 1990 | May 1, 1991 |
|---|---|---|---|
| Chef | 463.00 | 483.00 | 504.00 |
| Sauce Cook | 401.00 | 421.00 | 442.00 |
| Cook | 376.00 | 396.00 | 417.00 |
| Pot Washer | 332.00 | 352.00 | 373.00 |
| Dish Washer | 329.00 | 349.00 | 370.00 |
| Waiter (Full Time) | 354.00 | 374.00 | 395.00 |
| Waiter (Part Time) | 181.00 | 191.00 | 201.50 |
| Housemen | 329.00 | 349.00 | 370.00 |
| Nightwatchman | 343.00 | 363.00 | 384.00 |
| Head Bartender | 387.00 | 407.00 | 428.00 |
| Bartender | 382.00 | 402.00 | 423.00 |
| Coatroom Attendant | 358.00 | 378.00 | 399.00 |
| Captain | 395.00 | 415.00 | 436.00 |

## SCHEDULE "B"

1. As of May 1, 1989, waiters performing service for 3-1/2 hours lunch function shall receive $51.50 up to 15 covers. The rate as of May 1, 1990 shall be increased to $53.00 and as of May 1, 1991 increased to $55.50.

2. Waiters performing service for 4-1/2 hours dinner functions shall receive $62.50 up to 15 covers. The rate as of May 1, 1990 shall be increased to $65.00 and as of May 1, 1991 increased to $67.50.

3. If a waiter does not show up, the remaining waiters shall receive $3.00 for each extra cover they serve.

4. Waiters setting up and clearing off shall receive an extra $13.00 per function.

5. Setting up or clearing off shall consist of 30 covers.

6. The normal amount for a dinner buffet taken care of by a waiter shall be 25. In the event that due to an increase in the function, or failure of waiters reporting for work, for each 25 covers, the employer shall divide equally the proper amount of moneys among the waiters servicing the function.

7. When a party is scheduled for over 100 people the Club shall employ an extra dish washer whose pay shall be $56.50. (5/1/90 - $59.00) (5/1/91 - $61.50).

8. Extra lunch bartenders shall be paid $51.50 for 3-1/2 hours function. (5/1/90 - $54.00) (5/1/91 - $56.50).

For the Club

For the Union

-23-

Players Club
Stipulation of
Effective 5/1/92
Expires 6/30/96

Serial #

**42**

## STIPULATION OF AGREEMENT

IT IS HEREBY STIPULATED AND AGREED by and between Local 6 Hotel, Restaurant & Club Employees and Bartenders Union and THE PLAYERS that the following terms have been negotiated and shall be incorporated in a successor collective bargaining agreement:

1. Term of the Agreement: May 1, 1992 to June 30, 1996.

2. Wages: The increases to the wages contained in the current agreement shall be as follows:

   | | | |
   |---|---|---|
   | May 1, 1992 | — | $19.00 |
   | November 1, 1993 | — | $20.00 |
   | May 1, 1994 | — | $21.00 |

3. Grievance Procedure: The grievance procedures shall be as set forth in Exhibit A annexed hereto.

4. Management Rights: The management rights clause of the collective bargaining agreement shall be as set forth in Exhibit B annexed hereto.

5. Dental Fund: The Employer shall make contributions into the Club Employees Dental Fund. Such contributions shall be calculated on the base wages of each employee and shall be Two per cent (2%) thereof.

6. Emergency Service: The Employer may utilize employees for "emergency service" but only as a last resort. It is understood and agreed that the use of employees for said emergency service shall be discussed between the Union, the

employees and the Employer on the day following such emergency service to determine if an emergency actually existed and if any additional compensation is due for said services. In the event, the parties cannot agree, the dispute shall be resolved through arbitration.

7. **Termination Pay**: It is understood and agreed that an employee who has been discharged, and is found, after final and binding arbitration, to have been discharged for "just cause" is not entitled to receive termination pay and management shall not be obligated to make such payments.

8. **No Lockout/No Sympathy Strike**: During the term of the Agreement there shall be no sympathy strikes or any other Union activity directed against the business interests of operations of the Employer predicated upon a dispute between the Employer and any third-party. The Employer agreed that during the term of the Agreement there shall be no lock-outs. The Union agrees to cooperate with the Employer in every way possible to seek prompt discontinuance of any indicated or actual violation of this provision. The Union reserves the right to withdraw its members from the Employer's premises in the event the Employer's refusal to proceed to arbitration as provided herein. No employee may be discharged or otherwise disciplined from refusing to cross a picket line that may be placed in front of the Employer's establishment.

9. **Schedule B**: See Attached.

10.  <u>Study committee</u>:  The parties agree to fully cooperate and/or participate in any study committee authorized by the Club Insurance Fund Board of Trustees to review and recommend alternative methods of providing medical coverage to its members and employees.

Aldine ™ Enviro-Tab ™

Exhibit A    *Part 3 of 3*

## SCHEDULE "B"

1.  Waiters preforming service for 3-1/2 hours lunch function shall received $57.50 up to 15 covers as of May 1, 1992. (11/1/93 - $59.50) (5/1/94 - $61.50)

2.  Waiters preforming service for 4-1/2 hours dinner function shall received $69.50 up to 15 covers as of May 1, 1992. (11/1/93 - $71.50) (5/1/94 - $73.50)

3.  If a waiter does not show up, the remaining waiters shall receive $4.00 for each extra cover they serve as of May 1, 1992. (11/1/93 - $5.00) (5/1/94 - $6.00)

4.  Waiters setting up and clearing off shall receive an extra $13.00 per function as of May 1, 1992. (11/1/93 - $15.00) (11/1/94 - $16.00).

5.  Setting up or clearing off shall consist of 40 covers.

6.  The normal amount for a dinner ~~buffet~~ taken care of by a waiter shall be 30.  In the event that due to an increase in the function, or failure of waiters reporting for work, for each 30 covers, the employer shall divide equally the proper amount of moneys among the waiters servicing the function.

7.  When a party is scheduled for over 100 people the Club shall employ an extra dish washer whose pay shall be $61.50.

8.  Extra lunch bartenders shall be paid $56.50 for 3-1/2 hours function.


For the Club

For the Union          aug 17 92

- 4 -

## MANAGEMENT RIGHTS

The Union recognizes that except as expressly limited by the terms of this Agreement, the Employer has and retains every right including, but not limited to, the right to plan, direct and control operations, to hire, to lay off employees due to lack of of work, to maintain discipline and efficiency and to assign work.

## DELEGATE AND GRIEVANCES

The employees shall be entitled to elect a Delegate who shall be recognized by the Employer. All grievances and complaints of the workers shall be referred to this Delegate, so that they may be presented in an orderly and regular manner in accordance with the Grievance procedure set forth in Article XXXI.

## GRIEVANCE AND ARBITRATION

A. Adjustment of all complaints, disputes, controversy and grievances of any kind or nature arising between the Employer and the Union concerning the interpretation, operation, application, or performance of the terms of this Agreement or any complaint, dispute, controversy, or grievance involving a claimed breach of any term or condition of this Agreement shall be undertaken in accordance with the following procedure:

Step 1— Within 30 days of the occurence of the event giving rise to a grievance, the employee having a grievance and/or his/her Union delegate or his/her representative shall take up the grievance with his/her immediate supervisor. The Employer shall give its answer to the employee and his/her Union delegate or other representative within ten (10) working days after the presentation of the grievance.

Step 2— If a grievance is not settled in Step 1, the grievance

may, within ten (10) working days after the answer to Step 1, be presented in Step 2. When grievances are presented in Step 2, they shall be reduced to writing, signed by the grievant and his/her Union representative and presented to the Employer's Director who shall render a decision in writing within ten (10) days after the presentation of the grievance in this step.

Failure on the part of the Employer to answer a grievance at this or any other step shall not be deemed acquiescence thereto and the Union may proceed to the next step.

Any disposition of the grievance from which no appeal is taken within the time limits specified herein shall be deemed resolved and shall not thereafter be considered subject to the grievance and arbitration provisions of this Agreement.

Step 3- A grievance which has not been resolved hereunder may within fifteen (15) working days after the completion of Step 2 of the grievance procedure, be referred for arbitration by either the Employer or the Union to an arbitrator selected in accordance with the procedures of the American Arbitration Association.. The arbitration shall be conducted under the voluntary labor arbitration rules then prevailing by the American Arbitration Association.

Fees and expenses of the American Arbitration Association and the Arbitrator shall be borne equally by the parties.

The decision of the Arbitrator hereunder shall be final and binding upon the Employer, the Union and the employee. The Arbitrator shall not under any circumstances have power to add to, subtract from, or modify any of the terms of this Agreement.

The time limits herein may be extended by mutual writeen agreement of the parties.

| | |
|---|---|
| Serial #<br><br>**43** | **Players Club**<br>Stipulation of<br>Effective 7/1/96<br>Expires 7/1/2001 |

## STIPULATION OF AGREEMENT

**It is hereby stipulated** and agreed by and between HOTEL, RESTAURANT & CLUB EMPLOYEES AND BARTENDERS UNION, LOCAL 6, AFL-CIO and the PLAYERS CLUB that the following terms have been negotiated and shall be incorporated in the successor collective bargaining agreement:

1. <u>Term of the Agreement</u>  July 1, 1996 to July 1, 2001.

2. <u>Wages</u>  The increases to the wages contained in the current agreement shall be as follows:

   | | |
   |---|---|
   | July 1, 1996 | $16.00 |
   | July 1, 1997 | $16.00 |
   | July 1, 1998 | $16.00 |
   | July 1, 1999 | $16.00 |
   | July 1, 2000 | $16.00 |

2. The deletion of the holiday "Lincoln's Birthday."  The change of "Washington's Birthday" to "President's Day."

3. The increase in the number of Personal Days from two to three.

## SCHEDULE "B"

1. Waiters performing service for 3 and 1/2 hours lunch function shall receive as of July 1, 1996, $63.22; July 1, 1997, $64.94; July 1, 1998, $66.66; July 1, 1999, $63.38; July 1, 2000, $70.10.

2. Waiters performing service for 4 and 1/2 hours dinner function shall receive for twenty covers: July 1, 1996, $75.22; July 1, 1997, $76.94, July 1, 1998, 78.66; July 1, 99, $80.38; July 1, 2000, $82.10.

3.  If a waiter does not show up, the remaining waiters shall receive $6.00 per cover.

4.  Buffet covers will be 30 covers. Waiters setting up and clearing off shall receive an extra $16.00. Setting up and clearing off shall consist of 40 covers.

5.  The normal amount for a dinner buffet will be 30 covers in the event that due to an increase in the function, or failure of waiters reporting for work, for each 30 covers the employer shall divide equally the proper amount of monies among the waiters servicing the function.

6.  When a party is scheduled for over 100 people the Club shall employ an extra dishwasher whose pay shall be $61.50.

7.  Extra luch bartenders shall be paid $56.50 for 3 and 1/2 hours function.

8.  Medical Article XIV shall be amended to provide each employee with Oxford medical insurance, 120 days for each employee's spouse and all eligible unmarried children under 19 years of age. All at the Club's expense with the exception of a $5 copayment for an employee's doctor visit.

_Jan 30-97_

Hotel, Restaurant & Club Employees
and Bartenders Union, Local 6, AFL-CIO

The Players Club

_2/10/97_

## MEMORANDUM OF AGREEMENT

Memorandum of Agreement made this 1ust day of October, 2001, by and between the

Players (the "Club" or "Employer") and the Hotel, Restaurant & Club Employees and Bartenders

Union Local 6, HEREIU, AFL-CIO (the "Union").

Except as modified below, the terms and conditions of the Parties' collective bargaining

agreement, which expired on April 30, 1992, and which was modified and extended by a Stipulation

of Agreement dated August 17, 1992, and was further modified and extended by a Stipulation of

Agreement dated February 10, 1997, shall continue.

1.    <u>Duration</u>  Delete Article XXVII, Section (a) and replace with:

The Agreement shall be effective as of July 1, 2001 and shall continue in full force

and effect up to and including midnight June 30, 2006.

2.    <u>Retroactive Pay</u>  The wage increases provided for below shall be retroactive to July

1, 2001.

3.    <u>Wages</u>  Delete Article V, Section (c) and replace with:

(i)    All full-time employees shall receive weekly wage increases as follows:

| | |
|---|---|
| Effective July 1, 2001 | $17.00 |
| Effective July 1, 2002 | $18.00 |
| Effective July 1, 2003 | $19.00 |
| Effective July 1, 2004 | $19.00 |
| Effective July 1, 2005 | $19.00 |

(ii)    Part-time employees shall be paid weekly wage increases on a pro-rated basis,

based on the hours worked and according to the job classification rates provided for in Schedule A.

(iii)    Effective July 1, 2001, Kitchen Steward/Storeroom Attendant Joseph Laguerre shall receive a weekly wage increase of $67.00. Thereafter, the Kitchen Steward/Storeroom Attendant shall receive weekly wage increases in accordance with paragraph 3(i) of this Agreement.

4.    Delete Section 2 of Schedule B and replace with:

Effective July 1, 2001, Waiters performing service for 4-1/2 hours dinner function shall receive $104.00 for up to 20 covers.

5.    Delete Articles XIV (Group Insurance), XV (Pensions) and XVI (Dental Benefits) and replace with:

## ARTICLE XIV
## GROUP INSURANCE

(a)    The Employer shall begin to contribute each month to the New York Hotel Trades Council and Hotel Association of New York City, Inc. Health Benefits Fund (the "Health Benefits Fund") (the successor to the New York Hotel Trades Council and Hotel Association of New York City, Inc. Union Family Medical, Insurance and Dental Funds) a sum equal to six and three quarters percent (6.75%) of the wages of each employee covered by this Agreement for coverage under the medical benefits program portion of the Heath Benefits Fund. The Employer shall also begin to contribute each month to the Health Benefits Fund sums equal to seven and three quarter percent (7.75%) of the wages of each such employee and two percent (2%) of the wages of each such employee for coverage under the hospital and insurance benefits program portion and the dental benefits program portion, respectively, of the Health Benefits Fund. The Employer shall remit its contributions on or before the tenth (10th) day of each month.



(b)    It is expressly agreed and understood that if, during the term of this Agreement, the monthly contribution rate(s) to the Health Benefits Fund shall be increased under the terms of the Industry-Wide Collective Bargaining Agreement between the New York Hotel Trades Council, AFL-CIO and the Hotel Association of New York City, Inc. (the "Industry-Wide Agreement"), such increased rate(s) shall automatically apply to the Employer upon receipt of written notice from the Trustees of the Health Benefits Fund. In this regard, the Employer acknowledges that, under a Memorandum of Understanding dated June 15, 2000 which amends the Industry-Wide Agreement and extends it to June 30, 2006, the percentage rate of contribution for the combined medical benefits, hospital and insurance and dental benefits programs increase by one percent (1%) effective January 1, 2003, from sixteen and one-half percent (16.5%) to seventeen and one-half percent (17.5%). It is further expressly agreed and understood that the IWA requires the Trustees of the Health Benefits Fund to maintain projected liquid assets of the Fund at the end of each calendar year at not less than forty-five percent (45%) of the following year's expenses.

For the purposes of calculating contributions to the Health Benefits Fund under this Agreement, the term "wages," as defined in the Industry-Wide Agreement, shall be used. Therefore, "wages" includes overtime pay, vacation pay, holiday pay, sick leave pay, personal day pay, jury duty pay, military leave pay, family leave pay, bereavement pay, value of meals and lodgings where such are part of an employee's wages commencing from the first day of employment, whether such employment is on a regular full or part-time, casual, temporary, banquet or extra basis.

(c)    The Employer hereby adopts and agrees to be bound, and to abide by, all of the terms and conditions of the Health Benefits Fund's Agreement and Declaration of Trust, including the Audit Guidelines and Collection Procedures promulgated by the Trustees of the Health

Benefits Fund pursuant thereto, and the Health Benefits Fund's Summary Plan Description, as they each presently exist or as they each may hereafter be amended or modified and any interpretations of any of the foregoing. The Health Benefits Fund's Agreement and Declaration of Trust, Audit Guidelines and Collection Procedures and Summary Plan Description are all incorporated herein by reference.

(d) The Employer hereby agrees to execute any additional documents which may be prescribed by the Trustees of the Health Benefits Fund to effectuate and continue the Employer's participation as a contributing employer with respect to such Fund.

(e) For those employees on the Employer's payroll as of July 1, 2001, the Employer agrees that in the event after twenty (20) years' service with the Employer the employee retires at age sixty-two (62) or later, the Employer agrees to provide and maintain a life insurance policy for that employee in the amount of Five Thousand Dollars ($5,000.00) for the remainder of the employee's life.

(f) The Employer shall begin making monthly contributions to the Health Benefits Fund in the sum of Three Dollars and Forty-Five Cents ($3.45) for each employee covered by this Agreement, to provide benefits under the optical benefits program of the Health Benefits Fund. Said contributions shall be remitted on or before the tenth (10th) day of each month.

## ARTICLE XV
## PENSIONS

(a) The Employer hereby adopts and agrees to be bound, and to abide by, all the terms and conditions of the Agreement and Declaration of Trust of the Club Employees Pension Fund dated October 28, 1955 and agrees to accept and become a party to any amendments thereto.



(b)    The Employer shall contribute monthly for the duration of this Agreement to the Club Employees Pension Fund a sum equal to six and one-half (6.5%) percent of the base wages paid to the regular employees (but not extra or temporary employees) covered by this Agreement, i.e., regular straight-time earnings for a five (5) day week, excluding bonuses, overtime earnings and other premium pay and fringe benefits. The said contributions shall be remitted on or before the tenth (10th) day of each month.

(c)    The Trustees of the Club Employees Pension Fund shall have the right to request records from the Employer with respect to wages and employment, and shall have the right to examine said wage and employment records through duly authorized representatives, including certified public accountants.

(d)    The Union, in its name or the Club Employees Pension Fund, may institute an action or intervene in any proceedings at law, equity or bankruptcy, for the purpose of collecting any sums due the Pension Fund.

## ARTICLE XVI
## SCHOLARSHIP FUND

(a)    The Employer shall continue to contribute each month to the Hotel Trades Council and Hotel Industry Scholarship Fund (the "Scholarship Fund"), an amount equal to One Dollar ($1.00) to the Scholarship Fund for each employee covered by this Agreement. These contributions shall be used to provide higher education scholarship assistance for qualifying children of eligible employees. It is expressly understood and agreed that if, during the term of this Agreement, the above rate of monthly contribution to the Scholarship Fund shall be increased under the terms of the Industry-Wide Agreement, such increased rate shall automatically apply to the



Employer upon receipt of written notice from the Trustees of the Scholarship Fund.  The said contributions shall be remitted on or before the tenth (10th) day of each month.

      (b)     The Employer hereby adopts and agrees to be bound, and to abide by, all of the terms and conditions of the Scholarship Fund's Agreement and Declaration of Trust, including the Audit Guidelines and Collection Procedures promulgated by the Trustees of the Scholarship Fund pursuant thereto, and the Scholarship Fund's Summary Plan Description, as they each presently exist or as they each may hereafter be amended or modified, and any interpretations of any of the foregoing.  The Scholarship Fund's Agreement and Declaration of Trust, Audit Guidelines

      (c)     The Employer hereby agrees to execute any additional documents which may be prescribed by the Trustees of the Scholarship Fund to effectuate and continue the Employer's participation as a contributing employer with respect to such Fund.

      6.     This Agreement is conditional upon and subject to ratification by the bargaining unit.

Hotel, Restaurant & Club Employees and
Bartenders Union Local 6, HEREIU, AFL-
CIO

The Players

# SCHEDULE "B"

1.     Waiters performing service for 3-1/2 hours lunch function shall received $70.10.

2.     Waiters performing services for 4-1/2 hours dinner function shall received $104.00 up to twenty (20) covers as of July 1, 2001.

3.     If a waiter does not show up, the remaining waiters shall receive $6.00 per cover.

4.     Buffet covers will thirty (30) covers. Waiters setting up and clearing off shall receive an extra $16.00 per function. Setting up and clearing off shall consist of forty (40) covers.

5.     The normal amount for a dinner buffet will be thirty (30) covers. In the event that due to an increase in the function, or failure of waiters reporting for work, for each thirty (30) covers, the employer shall divide equally the proper amount of monies among the waiters servicing the function.

6.     When a party is scheduled for over one hundred (100) people the Club shall employ an extra dish washer whose pay shall be $61.50.

7.     Extra lunch bartenders shall be paid $56.50 for 3-1/2 hours function.

**Exhibit B**

# MEMORANDUM OF AGREEMENT

Memorandum of Agreement made this ___ day of March 2007, by and between the Players (the "Club" or "Employer") and the Hotel, Restaurant & Club Employees and Bartenders Union Local 6, UNITE HERE (the "Union").

Except as modified below, the terms and conditions of the parties' Collective Bargaining Agreement dated February 1, 1989, as modified and extended by a Stipulation of Agreement dated August 17, 1992, and as further modified and extended by a Stipulation of Agreement dated February 10, 1997, and as further modified and extended by a Memorandum of Agreement dated October 1, 2001, shall continue.

1. <u>Duration</u>  Delete Article XXVII, Section (a) and replace with:
The Agreement shall be effective as of July 1, 2006 and shall continue in full force and effect up to and including midnight June 20, 2011.

2. <u>Retroactive Pay</u>  The wage increases provided for below shall be retroactive to July 1, 2006.

3. <u>Wages</u>  Delete Article V and replace with below, and modify Schedule A accordingly:

    (i)    All full-time employees shall receive weekly wage increases as follows:

| | |
|---|---|
| Effective and retroactive to July 1, 2006 | $22.50 |
| Effective July 1, 2007 | $22.50 |
| Effective July 1, 2008 | $22.50 |
| Effective July 1, 2009 | $22.50 |
| Effective July 1, 2010 | $22.50 |
| Effective July 1, 2011 | $22.50 |

    (ii)    Part-time employees shall be paid weekly wage increases on a pro-rated basis based on the hours worked and according to the job classification rates provided for in Schedule A.

    (iii)   Other wages and wage related items shall be increased by the same percentage as the above described increases to weekly wages.

4. <u>Group Insurance</u>  Modify Article XIV as follows:

    (i)    Replace Section (a) with:    The Employer shall continue to contribute each month to the New York Hotel Trades Council and Hotel Association of New York City, Inc. Health Benefits Fund (the "Health Benefits Fund") (the successor to the New York Hotel Trades Council and Hotel Association of New York City, Inc. Union Family Medical, Insurance and Dental Funds) a sum equal to twenty and one-half percent (20.5%) of the wages of each employee covered by this Agreement for coverage under the medical, insurance and dental benefits program portion of the Health Benefits Fund. The Employer shall remit its contributions on or before the tenth (10th) day of each month.

(ii)    Replace Section (f) with:        Effective and retroactive to July 1, 2006, the Employer shall increase its monthly contributions to the Health Benefits Fund to the sum of Three Dollars and Eighty Cents ($3.80) for each employee covered by this Agreement, to provide benefits under the optical benefits program of the Health Benefits Funds. Effective and retroactive to January 1, 2007, such contributions shall increase to the sum of Three Dollars and Ninety-Five Cents ($3.95). Said contributions shall be remitted on or before the tenth (10th) day of each month.

5.    <u>Pensions</u> Add to end of Article XV, Section (b):

Effective July 1, 2007, the Employer shall increase its monthly contributions to the Club Employee Pension Fund to the sum equal to seven and one half percent (7.5%) of the wages paid to each employee under this Agreement.

6.    <u>Sick Leave</u>  Modify Article XVII, Section (a) as follows:

To increase sick days from six (6) to seven (7) days.

7.    <u>Arbitration</u>  Delete Article XXII and replace with:

In the event of any dispute or controversy of any nature whatsoever between the parties or with reference to the interpretation or application of this Agreement, the matter, question or dispute, shall be referred to a rotating panel of four (4) arbitrators, two (2) to be selected by the Union and two (2) by the Employer. The Union has selected arbitrators Ira Drogan and Elliot Shiftman, with the Employer selecting the remaining two (2). The decision of the arbitrator shall be final and binding on the parties hereto.

8.    <u>Schedule "B"</u> Add to end:

(i)    Each waiter performing service on any lunch shift shall be guaranteed four and one half (4.5) hours of pay.

(ii)    Each waiter performing service on any dinner shift shall be guaranteed seven (7) hours of pay.

9.    This Agreement is conditional upon and subject to ratification by the Union.

_____
Hotel, Restaurant & Club Employees and
Bartenders Union Local 6, UNITE HERE.

The Players

6-28-07
_____
Date

6/7/07
_____
Date

*Improper forum*

---

In the Matter of the Arbitration
Between

Local 6, Hotel Restaurant & Club Employees and
Bartenders Union, UNITE-HERE

And

The Players Club

---

**AWARD OF**

**ARBITRATOR**

**Before:  Ira Drogin, Esq., Arbitrator**

For the Union:            Michael D'Angelo, Esq.

For The Players Club:      Regina Faul, Esq.

The undersigned has conducted hearings in this matter on October 30 and November 26, 2007.  After considering all of the evidence and the post-hearing briefs of both sides, I hereby make the following Award.

## FACTS

The Union and the Players Club ("Club") have been parties to a series of Collective Bargaining Agreements ("CBA") since February 1, 1989, with the most recent agreement being a Memorandum of Agreement ("MOA") dated June 7, 2007.  The CBA and MOA have been submitted as Joint Exhibit #1.  Pursuant to Schedule "A" of the CBA, bargaining unit work consists of all Food and Beverage service, (Chef, Sauce Cook, Cook, Pot Washer, Dishwasher, Full and Part-time

Waiters, Captains, Head Bartender and Bartender, Housemen, Night Watchmen, and a Coat Room Attendant). The Club is traditionally closed for Food and Beverage service for the period August 1 through Labor Day. On August 13, 2007, the Club sent a notice to all Food and Beverage service employees as follows:

> On Thursday, August 9, The Players signed an agreement that leases our food and beverage service to Elegant Affairs NY.
>
> Having worked here for the period of time that you have, I'm sure that this development comes as no surprise to you. With the losses that the club has incurred at lunch, in the Grill and in the Dining Room, there was no way that we could continue to provide food and beverage service to our members. This agreement allows Elegant Affairs NY to continue to provide full service to our membership. The Players is no longer in the food and beverage business.
>
> Accordingly, as of August 9, you are no longer in the employ of The Players.
>
> Thank you for your time of service to us and best of luck to you and your family.

This notice was sent approximately six weeks after the Club negotiated and executed its new MOA with the Union, which, among other things, provided for wage increases for the Club's Food and Beverage service employees. It is undisputed that the Club terminated its Food and Beverage operation and entered into an agreement on July 27, 2007, with Elegant Affairs NY, Inc. ("Elegant"), effective August 1, 2007, for Elegant to be the exclusive Food and Beverage provider at the Club, utilizing its own employees.[1] Since then, the Club has continued to function as before as a place of social gathering for Club members and for the public in general, providing Food and Beverage service for its members and guests.

---

[1] This contract will be discussed hereinafter.

## THE APRIL 2006 CONTRACT BETWEEN THE PLAYERS CLUB AND ELEGANT AFFAIRS

The Club and Elegant Affairs entered into a written agreement dated April 6, 2006 ("Agreement"). The term of the Agreement was slightly more than ten years. The Agreement provided that it could be terminated by either party upon written notice. Under its terms, Elegant Affairs was designated as the exclusive caterer at the Club. The parties agreed that Elegant Affairs was to utilize the services of the Club's employees at the events catered by Elegant. The Club was to pay the wages and all fringe benefits for those employees and Elegant Affairs was to compensate or reimburse the Club for the actual cost of the wages and fringe benefits. In addition, the Agreement allowed Elegant Affairs to utilize its own employees in the event that it required additional employees and in such event, Elegant Affairs was to be responsible for all wages and employee benefits for those additional employees.

It is noteworthy that the Elegant Affairs employees were not required to be members of the Union nor was Elegant Affairs to attempt to obtain additional employees from the Union before it could hire additional employees. The Agreement provides that the Club's employees shall remain at all times, employees of the Club and are to be represented for collective bargaining by Local 6. The Agreement expressly states that employees of Elegant Affairs are not represented by any Union.

The Agreement goes on to state that neither party shall be deemed to be a joint employer and that the Club shall be solely responsible for the wages and fund benefits due its employees. The very next sentence provides that employees of Elegant Affairs are not covered by or subject to any collective bargaining agreement and that Elegant Affairs is not responsible for contributions to any Union pension or health and welfare fund. Under this Agreement, Elegant

was to pay the Club a commission based on gross billing of affairs booked and conducted by Elegant.

The Agreement further provides "The Club shall inform the union that represents employees of the Club, as well as those pension and/or health and welfare benefit funds to which the Club make contributions, as to the provisions of this Agreement and shall obtain their acknowledgement and approval of its terms. In the event such approval is not obtained, the Club will provide immediate notice of same to Elegant Affairs." The Club and the Union stipulated that no written notification was given to the Union regarding the terms of the Agreement, and no written approval of the Union was obtained.

There was no evidence whatsoever that the Union was ever made aware of the terms of this Agreement. This is not surprising, as it would be highly unlikely that the Union would grant its approval to a mid-term modification of its CBA that allowed Elegant to bypass the Union by hiring non-Union employees and for Elegant to continue as a non-Union caterer at a Union club. There is also no evidence that the Club provided "immediate notice" to Elegant that such approval had not been obtained from the Union and its related funds.

Although the term of this Agreement was a little bit over ten years, it was superceded sixteen months later by another agreement between the Club and Elegant Affairs.

## THE JULY 2007 AGREEMENT

Effective August 1, 2007, approximately six weeks after the Union and the Club entered into a new MOA, re-adopting the CBA except as modified by the MOA, the Club and Elegant Affairs entered into a twenty-year agreement with

two, five-year automatic renewal provisions with the Club having the right for sixty days prior to the first automatic renewal term, to terminate the Agreement on the terms set forth therein. A reading of this Agreement indicates that the preceding April 2006 Agreement was in the nature of a trial, during which the Club and Elegant could determine whether or not they could work together, and whether, in doing so, it made financial sense for both parties. Under the old Agreement, Elegant paid the Club a commission based on gross billings of eight percent (8%) the first and second years, nine percent (9%) during the third year, and ten percent (10%) thereafter. Undisputed evidence submitted by the Club as well as testimony has established that for many years, the Food and Beverage operation of the Club were running at a substantial loss and that the Club's financial condition, for other reasons, presented a serious difficulty.[2] It is easily understandable that the Club concluded that contracting out its Food and Beverage operations would be profitable and would greatly reduce its deficit. Under the 2007 Agreement, Elegant agreed to pay the Club a commission for catered parties based on gross billing and receipts of 8% the first and second years, 9% the third year, 10% thereafter, and beginning in year 6, two percent (2%) of the gross receipts from Food and Beverage and liquor charges of members and their guests.

Once again, Elegant was to be the exclusive Food and Beverage provider at the Club and was to be responsible for servicing the needs of the Club and its members, including lunches, brunches, dinners, and bar operations. In addition, Elegant was to conduct business and social catering, parties, celebrations, fundraisers, and similar events for the Club, its members and for the general public. In addition to paying the Club the aforementioned percentages, Elegant was required to pay the Club five hundred thousand dollars ($500,000) for the license to operate Food and Beverage service. The Agreement required that this

---

[2] The Club's August 13, 2007 termination letter to its Food and Beverage employees also refers to these losses.

sum be dedicated to the Club's payment of some liabilities, not to exceed one hundred thousand dollars ($100,000) and for capital improvements to the building. An initial payment of $100,000 was due within thirty days of signing to be followed by eight annual installments of $50,000 each.

The 2007 Agreement eliminated the Club's former employees from Food and Beverage service. It substituted Elegant as the employer of all Food and Beverage employees and made those non-Union employees subject to the rules and regulations of Elegant. It provided that Elegant shall be solely responsible for the payment of wages, taxes and any employee benefits. The Agreement also contained a request from Elegant that the Club's Board of Directors consider the institution of a monthly/annual Food and Beverage minimum, stating that Elegant believes that such will stimulate member use and goes on to suggest that a possible minimum be imposed on new members admitted to the Club and that the present membership be grandfathered out of said minimum.

It is clear from this contractual history, as well as the financial reports, testimony at the Hearing, and the Club's termination letter to its Food and Beverage employees (which referred to the Club's Food and Beverage losses), that the decision to contract the bargaining unit work out to Elegant was based solely on financial circumstances and the continuing deficit incurred by the Club in its Food and Beverage operations. This deficit was attributed by the Club's financial statements as being due in large part to the Club's labor costs, despite the assertion to the contrary in the Club's brief. The 2007 contract with Elegant was not the result of a decision to change the very nature of the enterprise, nor was it an entrepreneurial consideration affecting the scope and direction of the business enterprise which, according to established labor law does not require decisional bargaining in order to subcontract, but only requires effects bargaining. The Club remains a club for members and guests and for catered

affairs to be run by Elegant at the Club, essentially using the Club's name, prestige, and physical structures for a profit for Elegant and for the Club. Any suggestion or claim by the Club that the decision to subcontract was not based solely on economic motivation is rejected in view of the contractual evidence and the history of financial problems of the Club. Similarly rejected as not supported by the evidence, is the claim in the Club's post-hearing brief that the Club changed the essential nature of its business.

Although the Club claimed at the Hearings and again in its post-Hearing brief that months prior to the cessation of services and any agreement with Elegant, the Club advised the Union of its intent to discontinue services and enter into an agreement with Elegant, no evidence whatsoever has been produced to support this contention. To the contrary, the Club has admitted that it failed in its contractual requirement to Elegant, contained in Paragraph #5 of its ten-year April 2006 contract with Elegant to inform the Union and its related Benefit Funds of the provisions of the Agreement and to obtain the acknowledgement and approval of the Union and the Funds as to the terms of the Agreement. There was no evidence submitted that the possible cessation by the Club of its Food and Beverage service, or the contracting of that service out, was ever discussed during the course of the 2007 CBA negotiations. Again, although the Club claims it informed the Union during the course of the 2007 collective bargaining negotiations that it intended to, or might contract out its Food and Beverage operations, no supporting evidence to this effect has been produced by the Club and the Union claims it was never discussed during collective bargaining negotiations and that it was "blindsided" by the discharge of all Food and Beverage employees just weeks after a new Collective Bargaining Agreement was reached.

## POSITIONS OF THE PARTIES

### ARBITRABILITY

The Club's position is that the dispute is not arbitrable under the terms of the CBA. The Union's position is that the dispute is arbitrable. In its Amended Demand for Arbitration, the Union set forth the issues to be arbitrated as: "Whether the Employer failed to negotiate a mandatory subject of bargaining with the Union concerning the subcontracting of Food and Beverage service to Elegant Affairs NY and the effects thereof and, if so, what shall be the remedy? Whether the Employer violated the terms of the parties' Agreement, including but not limited to the retroactive and termination pay provisions thereof and, if so, what shall be the remedy?"

The arbitration provision contained in the MOA reads as follows: "In the event of any dispute or controversy of any nature whatsoever between the parties or with reference to the interpretation or application of this Agreement the matter, question or dispute, shall be referred to a rotation panel of four (4) arbitrators...the decision of the arbitrator shall be final and binding on the parties hereto."

The above arbitration provision is what is commonly referred to as a broad arbitration clause. It encompasses any dispute or controversy of any nature as well as disputes with regard to the interpretation or application of the Agreement.[3] The Union clearly asks for an interpretation or application of the Agreement when it submits as an issue, whether the Club violated the terms of the parties' Agreement. More specifically, the root of the grievance deals with

---

[3] See Pitta v. Hotel Association of New York City, Inc. 802 F. 2d 419,422 (2d Cir. 1986), Abraham Landau Real Estate v. Bevona, 123 F.3d 69, 74-75 (2d Circ. 1997), Vittoria Corp. v. New York Hotel & Motel Trades Council, 30 F Supp. 2d 431 (SDNY 1998)

the Union's claim that the Club subcontracted its Food and Beverage service to
Elegant without negotiating with the Union. This subsumes a claim by the Union
that the alleged contracting out violated the CBA. The question of arbitrability is
not even a close question. The Union's grievances clearly fall within the authority
given the arbitrator by the parties to hear this dispute. The dispute herein calls
for the arbitrator to interpret and apply the CBA, in context, and in its entirety to
the positions of the parties. The Club's position regarding arbitrability lacks merit
and is rejected.

Nor does the Club's claim that it acted as of right by virtue of the
Management Rights clause in the CBA preclude arbitration. In Timken Roller
Bearing Co. v. NLRB 162 F 2d 949, 20 LRRM 2204 (6th Cir 1947), the employer
claimed the right to subcontract under the management rights clause of the CBA.
The Court held the dispute "was a dispute as to the interpretation of the
management rights clause and the contract specifically provided that such
disputes were arbitrable. I too find the disputes herein arbitrable under the CBA.

## MERITS OF THE DISPUTE

The Union claims that the Club has subcontracted bargaining unit work in
violation of the CBA. It acknowledges that under the CBA, the Club had the right
to totally discontinue Food and Beverage service, but that it did not have the
contractual right to discharge its own Food and Beverage employees and to
replace them with Elegant's employees, which employees perform the same
Food and Beverage service as the Clubs discharged employees. It
acknowledges that the Club had the contractual right to lay off employees due to
lack of work, but that the action taken by the Club was not a lay off due to lack of
work, but was a subcontracting of their work, simply replacing bargaining unit

Union employees with non-Union Elegant employees performing the same bargaining unit work, all in violation of the CBA and of the law.

As a "fallback" position, the Union maintains that at the very least, the Club was required to bargain in good faith, to impasse, regarding the Club's decision to subcontract before subcontracting Food and Beverage operations and that it failed to do so. In addition, it argues that even if the Club had the contractual right to subcontract the bargaining unit work to Elegant, it was required to bargain in good faith with the Union with regard to the effects of the subcontracting, such as preferential re-hiring, recall rights, re-training, etc.

The Union relies on the following contractual provisions in support of its arguments: Sections 2, 3, 10, and 25 of the 1989 CBA, and Section 6 of the 1992 Stipulation (included in Joint Exhibit #1).

The Union finally urges that since the CBA is silent on the issue of subcontracting, at the very least, the Club was obligated to bargain in good faith with the Union to impasse before it could subcontract the Food and Beverage service to Elegant.

To the contrary, the Club's position is that the contractual Management's Rights clause constituted the required bargaining in good faith and also constituted an unequivocal waiver by the Union of bargaining on the subject of subcontracting. The Club's position is that while the CBA does not directly prohibit subcontracting, it contains a Management Rights Clause, which, by not expressly prohibiting subcontracting, allows the Club to subcontract without the necessity of engaging in negotiations with the Union with regard to its decision to subcontract, and, if it does subcontract, that it is not required to negotiate with the Union with regard to the effects of such subcontracting.

The contractual language relied upon by the Club is as follows:

> The Union recognizes that except as expressly limited by the terms of this Agreement, the Employer has and retains every right including, but not limited to, the right to plan, direct and control operations, to hire, to lay off employees due to lack of work, to maintain discipline and efficiency and to assign work."

The Club reasons that since the aforementioned language preserved every right to the Club, including its right to direct and control operations, and since, according to the Club, there is no express language in the CBA prohibiting or disallowing subcontracting, the Club has the contractual right to subcontract any part of its operations. It logically follows, according to the Club, that since subcontracting has already been addressed by the parties in the Management Rights clause, and because subcontracting has not been expressly limited by the Agreement, the Club was not required to negotiate its decision to subcontract.

Additionally, posits the Club, the CBA has contemplated the effects of subcontracting in Article IV, Paragraph b of the CBA, which states: "Nothing herein shall be construed to limit the Employer's right to reduce the number of employees in any classification when warranted by business conditions..." Finally, the Club has submitted documentary evidence in the form of certified financial statements showing that since 2003, the Food and Beverage operations at the Club have operated at a substantial financial loss to the Club, thereby the Club argues it may reduce the number of employees providing Food and Beverage services to zero.

With regard to effects bargaining, the Club points to Article XIII of the CBA – Termination Pay, which states: "Upon termination of the employment of any employee covered by this Agreement for any reason whatsoever, the Employee

shall be entitled to termination in the following amounts..." Accordingly, argues the Club, the parties contemplated elimination of services and its effects and made provisions for that in the CBA. Therefore, this constitutes a waiver of any right the Union may have had to require the Club to engage in effects bargaining.

## APPLICABLE LAW – GENERAL PRINCIPLES

Both learned and experienced counsel for the parties agree upon a number of general provisions of Labor Law. In general, it is well settled that subcontracting, eliminations, changes in terms and conditions of employment and the loss of work opportunities resulting from such changes are mandatory subjects of bargaining under the National Labor Relations Act ("NLRA"). The bargaining obligation with regard to the decision to subcontract is a mandatory subject of bargaining despite the employer's financial position or its continuing losses in operating Food and Beverage service at the Club, as is the case herein.[4] It is only "core entrepreneurial decisions" that lie outside of the scope of the bargaining obligation. Unilateral action by an employer in subcontracting constitutes a *per se* breach of the NLRA. Waiver of these rights by the Union must be supported by clear and unequivocal evidence of the Union's intent to waive them.

The Board, in considering contractual waiver clauses in which it is claimed that a union has contractually waived its right to bargain, has held: "...a union's right to be notified and consulted concerning any substantial change in employment may be waived by contract, but such waiver must be expressed in clear and unmistakable terms, and will not lightly be inferred." Furthermore, the

---

[4] An emergency exception to the duty to bargain regarding a decision to subcontract is recognized by the law. Under the facts of this case, namely a loss in the Food & Beverage operation, which has been going on for many years and the decision to subcontract that operation for profit rather than eliminate it, that exception is not applicable to this case.

Board reiterated that even where a waiver clause is stated in sweeping terms, it must appear from an evaluation of the negotiations, that the particular matter in issue was fully discussed or consciously explored and that the matter in issue was fully discussed or consciously yielded or clearly and unmistakably waived its interest in the matter.  (Eaton, Yale and Towne, 171 NLRB 600, 68 LRRM 1129, 1131 (1968)

Normally, a mere catchall phrase in a management rights clause to the effect that, "all management rights not given up in the contract are expressly reserved to it" falls short of being a clean and unmistakable relinquishment. Proctor Mfg Corp., 131 NLRB 1166, 48 LRRM 1222 (1969).  Contrast this with Allison Corp. 330 NLRB 1363,1365,166 LRRM 1064, 1067 (2000), where the Board held that where a management rights clause "specifically, precisely and plainly" granted the employer the right to subcontract without restriction, there was no obligation to engage in decision bargaining with the union.

It is presently NLRB law that if the employer's decision turned on a reduction of labor costs, the decision would be a mandatory subject of bargaining.  In Fibreboard Paper Prods. Corp v. NLRB 379 US 203 (57 LRRM 2609) 1964, it was held that, "…the type of 'contracting out' involved in this case – the replacement of employees in the existing bargaining unit with those of an independent contractor to do the same work under similar conditions of employment – is a statutory subject of collective bargaining under §8(d)."

It is also clear that a party wishing to make a mid-term modification to a CBA may not unilaterally impose or institute changes in mandatory subjects of bargaining before reaching a good faith impasse in bargaining with the incumbent Union.  Section 8(d) of the NLRA also requires that if an employer seeks to modify the terms and conditions contained in the CBA, Union consent

must be obtained before implementing the change. If a mandatory subject of
bargaining is not specifically covered in a CBA, it is well established that the
employer must bargain with the Union with regard to the implementation of such
a term and condition of employment. If however, a subject has been
unequivocally waived by the Union, there is no obligation to bargain in good faith
to impasse before implementation.

In re Jacobs Mfg. Co. 94 NLRB 1214, (1951), affd. 196 F. 2d 680 (2d Cir
1952), the NLRB held, and its decision was affirmed by the Court of Appeals,
that, "...those bargainable issues which have never been discussed by the
parties, and which are in no way treated in the contract, remain matters which
both the union and the employer are obligated to discuss at any time." The
Board emphasized however: "And if the parties originally desire to avoid later
discussion with respect to matters not specifically covered in the terms of an
executed contract, they need only so specify in the terms of the contract itself." I
conclude the management rights clause in the instant case falls short of such
specificity.

## THE ISSUES

The Club has submitted certified financial statements showing that its
Food and Beverage operations were running at a substantial loss since at least
2003. The deficit has been as high as about a million and a quarter dollars
($1,250,000) per year, almost all of which has been attributed in the financial
statements to labor costs. As a result, the Club certainly had a number of
obvious economic options available to it. Under the CBA, it could reduce its
Food and Beverage operation and reduce the number of Food and Beverage
employees that it employed. It could also totally eliminate the Food and
Beverage operations altogether and be within its contractual rights. Additionally,

if the Club chose to do so, it could assess all members a periodic Food and Beverage charge[5] and/or could "grandfather" existing members and assess new members and could consider other means of reducing its losses on Food and Beverage operations.[6]  But, the underlying question here is whether the Club had the right to subcontract its Food and Beverage operations to Elegant.  If it did not, did it first have to negotiate in good faith with the Union to an impasse?  The corollary question if the Club had the contractual right to subcontract is what obligation, if any, did the Club have with regard to effects bargaining.

## DISCUSSION

The first issue is whether the Club subcontracted bargaining unit work.  It is clear, and I find that the Club has subcontracted bargaining unit work to Elegant.  It did not, as it argues, reduce its workforce to zero.  By virtue of its 2007 contract with Elegant, it simply subcontracted the Food and Beverage service out to Elegant.

The next and main issue is whether the Club had the contractual right to subcontract the bargaining unit work.

Both of the parties agree that the CBA between the Union and the Club is unique, as it is tailored to the operations of this particular club.  It is not an Industry Wide Agreement, and the Management's Rights language relied on by the Club was added to the 1989 CBA in 1992.  No previous dispute has arisen between the parties with regard to the application or interpretation of this

---

[5] As suggested by Elegant in the 2007 contract with the Club.
[6] According to the financial statements submitted by the Club, this deficit began to improve as a result of the 2006 Agreement with Elegant Affairs, which resulted in lower labor costs for the Club plus commission income.  As a result of the 2007 Agreement with Elegant Affairs, the Club completely eliminated its Food and Beverage labor cost of about nine hundred seventy thousand dollars ($970,000) and replaced those costs with commission income from Elegant Affairs, plus a substantial cash payment to be applied to the Club's deficit.

language, and the history of this dispute shows that the Club continued its unprofitable Food and Beverage operations up until the summer of 2007. Neither side has been able to support their positions with regard to the meaning and application of the Management Rights language to this dispute by way of precedential decisions from this Office involving identical or evenly closely identical contractual language. The present dispute is therefore a matter of first impression.

In considering the meaning and application of contractual language, the intention of the parties in the context of the operation of the business and the concerns of the Union, must be sought. In the instant case, the contract language provides that except as expressly limited by the terms of this Agreement, the employer retains every right. What follows are examples of various exemplary express rights, prefaced by the phrase, "including, but not limited to". Both sides agree that when the MOA was executed in the summer of 2007, some six weeks before the July 27, 2007 Agreement between the Club and Elegant. I find there were no proposals by either side dealing with the subject of subcontracting and I find there was no discussion of subcontracting, even though subcontracting must have been in the mind of the Club, which had contracted with Elegant in 2006, to cater Food and Beverage operations at the Club using the Club's employees, thereby passing on to Elegant the Club's labor costs with regard to events conducted at the Club by Elegant and making a profit on those events under its contract with Elegant. Just when the discussions started between the Club and Elegant that resulted in the July 27, 2007 contract under which all Food and Beverage operations would be performed exclusively by Elegant employees, was not established at the hearing. But it is a fair and logical assumption that because the 2006 Agreement with Elegant proved to be financially beneficial to the Club, contracting out the entire Food and Beverage operation to Elegant was within the contemplation of the Club while it was

engaged in collective bargaining negotiations with the Union, which led to the 2007 MOA. It is also noteworthy that in the 2006 Agreement between the Club and Elegant, the Club was required to give the Union notice of the Agreement and obtain the Union's approval. It is undisputed that the Club did not do so. It seems therefore, that when the Union went into negotiations with the Club, which resulted in the 2007 MOA, the Union was, as it claims, unaware of the direction the Club was moving and the possibility that the Club might subcontract its Food and Beverage operations out, and was in effect, blindsided by the Club's subcontracting that work to Elegant six weeks after the 2007 MOA was agreed to.

The Union relies on certain contractual provisions, the effect of which, it argues, constitute an express limitation on the Club's claim that it has reserved the right to unilaterally subcontract this work. It urges that Article III of the CBA merits consideration regarding the issue. That Article provides among other things, the requirement that the Employer must first apply to the Union to supply it with new employees and if the Union cannot supply the required employees within 48 hours after the Employer has advised the Union to supply such a candidate for employment, the Employer shall have the right to engage such help in the open market.

The Union also points to Article X of the CBA entitled "Replacements", which provides that all new employees shall be hired at the rate of pay for the classifications set forth in Schedule "A" annexed to the CBA.

Also relied on by the Union is Article XXV of the CBA, entitled "Successor Clause", which provides that the Agreement shall be binding upon the Successors and Assigns of the parties, and that no provision, terms, or obligations shall be affected, modified, altered, or changed in any respect

whatsoever by the consolidation, merger, sale, transfer or assignment of either party or affected, modified, altered, or changed in any respect whatsoever by any change of any kind in the legal status, ownership, or management of either party.

The Union also relies on Article 6 of the 1992 Stipulation of Agreement entitled "Emergency Service", which provides that the Employer may utilize employees for "emergency service" but only as a last resort.

A final provision of the CBA relied on by the Union is Article II, "The Recognition Clause", which provides that the employer recognizes the Union as the sole collective bargaining agent for the classifications of employees set forth in Schedule "A".

The Club's argument is that none of the aforementioned common, standard provisions, found in many collective bargaining agreements, trump the express language of the Management's Rights Clause, reserving to the Employer every right except as limited by the terms of the Agreement. It argues that none of the contractual provisions relied upon by the Union expressly limit its right to subcontract. If this argument is accepted, the Club had and has no obligation to bargain with the Union over its decision to subcontract and furthermore, since the CBA provides for termination pay, it has no obligation to engage in effects bargaining.

I find no merit in the Union's argument with regard to the Successors and Assigns provision or the Emergency Service provision. There has been no change in the legal status ownership or management of the Club. Nor does the "Emergency Service" provision, the purpose of which is to clarify and restrict the performance of bargaining unit work by Management of the Club, constitute an express restriction on subcontracting. But, I find that the bargaining unit

recognition clause coupled with the requirements of the CBA that the Club must first apply to the Union to supply it with new employees and that new employees must be hired at the pay rates contained in Schedule A, evidences the intent of the parties that the Club is restricted from eliminating bargaining unit employees and replacing them with the employees of Elegant at Elegant's pay rates. That is the plain impact of what the Club has done and the labels "subcontracting" or "contracting out" are merely descriptive words.

I agree with the rationale and result reached by Arbitrator Hogan in A.D. Juillard Co. 21 LA 713, 724, where he said:

> After a thoughtful consideration of the this question the Arbitrator concludes that the Recognition Clause when considered together with the Wage Clause, the Seniority Clauses, and other clauses establishing standards for covered jobs and employees limits the Company's right to subcontract during the term of the Contract. The Contract sets forth standards of wages and working conditions applicable to those employees and those jobs covered by the Recognition Clause. When the Contract was signed the employees in the mending room were on the covered jobs, and the Contract contemplated that work normally performed by them would continue to be so performed as long as the work was available. To allow the Company, after signing an agreement covering standards of wages and conditions for mending room jobs and employees, to lay off the employees and transfer the work to employees not covered by the agreed standards would subvert the Contract and destroy the meaning of the collective bargaining relation.

## AWARD

## THE REMEDY

I conclude that the Club breached its agreement with the Union and clear NLRB labor law by contracting out its Food and Beverage service to Elegant and discharging its Food and Beverage bargaining unit employees and replacing

them with the subcontractors employees, all without engaging in good faith
collective bargaining on the subject with the Union. I find that the management
rights clause does not permit the Club to subcontract out bargaining unit work. I
find the Club has neither sought nor obtained a mid-term modification of the
CBA, nor has it even attempted to bargain in good faith to impasse with the
Union on the subject of subcontracting. I find no waiver by the Union of its rights,
and I find payment by the Club of "termination pay" is not a substitute for effects
bargaining even if the Club had the right to subcontract, which it does not have. I
find the Club's breach of contract motivated solely by economic gain from
unlawful subcontracting, to the detriment of its long-term employees who have
suddenly been cast out of their longtime jobs and replaced by non-Union
employees whose lesser cost to Elegant allows Elegant to pay a commission on
Food and Beverage service to the club, plus $500,000 over the term of its
contract with the Club.

    The Club urges that if I find the subcontracting to be unlawful, or violative
of the CBA, I apply the "Transmarine" remedy. (Transmarine Navigation Corp.
etc 170 NLRB 389, 67 LRRM 1419 (1968)). Transmarine is inapplicable as to
remedy as the decision to close the terminal was based "solely on greatly
changed economic conditions, to terminate its business and reinvest its capital in
a different enterprise in another location as a minority partner..." Under those
circumstances, the employer's decision was not a mandatory subject of collective
bargaining and only effects bargaining was required, and ordered, tailored to the
facts. The only part of Transmarine I find applicable is the NLRB's guidance that,
when it is impossible to re-establish a situation equivalent to that which would
have prevailed had the employer more timely fulfilled its statutory bargaining
obligation, in fashioning an appropriate remedy, we must be guided by the
principle that the wrongdoer, rather than the victims of the wrongdoing, should

bear the consequences of their unlawful conduct, and that the remedy should be adapted to the situation that calls for redress.

First:    I order and direct the Club to immediately cease and desist from subcontracting its Food and Beverage service to Elegant Affairs, and to cease and desist from allowing Elegant Affairs to conduct any Food and Beverage operations at the Club with employees of Elegant Affairs.

Second:    If the Club wishes to reinstitute its Food and Beverage service it shall offer reinstatement, in writing, to the employees who it discharged, without loss of seniority and with all benefits, with benefit funds payment and credits from the period between their discharge up to the date of the offer of reinstatement.

Third:    With regard to all employees offered reinstatement due to resumption of Food and Beverage operations, the Club shall make those employees whole for any loss of pay or other lost contractual benefits they may have sustained, less any sum previously paid to such employees as termination pay.

Fourth:    If the Club decides not to provide any Food and Beverage service to its members and/or to the general public, it shall promptly notify the Union of such an intent, in writing, and meet with the Union to negotiate in good faith, the effects of such cessation upon the terminated bargaining unit employees, including but not limited to any loss of income and benefits sustained by those employees, from the date of their termination up to the date the Club notifies the Union of such a decision. Jurisdiction is retained in the event the

Union and the Club are unable to reach an agreement under this paragraph.

Fifth:    In the event the Club wishes to contract out, or subcontract, any part, or all of its Food and Beverage service, it shall provide the Union with written notice its intent to make a mid-term modification of its agreement with the Union and the parties shall then exercise their rights under applicable law.

Dated:    January 15, 2008
          New York, New York

          IRA DROGIN, an Attorney at Law, licensed to practice in the State of New York, under the penalties of perjury duly affirms that he is the arbitrator described herein, and that he executed the foregoing instrument.

          _____
          ARBITRATOR

Index No. 08- Year 20

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

THE PLAYERS,

Plaintiffs,

-against-

PETER WARD, as president of LOCAL 6, HOTEL, RESTAURANT & CLUBEMPLOYEES AND BARTENDERS UNION, UNITE-HERE

Defendants,

## NOTICE OF PETITION

**KAUFMAN DOLOWICH & VOLUCK LLP**
Attorney(s) for Plaintiff
Office and Post Office Address, Telephone
**135 CROSSWAYS PARK DRIVE, SUITE 201**
**WOODBURY, NEW YORK 11797**
**TELEPHONE (516) 681-1100**
**FACSIMILE (516) 681-1101**

**To**

**Attorney(s) for**

**Service of a copy of the within** **is hereby admitted.**

**Dated,**

**Attorney(s) for**

**Sir: Please take notice**

☐ *NOTICE OF ENTRY*
that the within is a (certified) true copy of a
duly entered in the office of the clerk of the within named court on 20

☐ *NOTICE OF SETTLEMENT*
that an order of which the within is a true copy will be presented for settlement to the HON. one of the judges
of the within
on the M.

Dated,

COMPLIANCE

To the best of the ... after an inquiry re... and contentions ... §130-1.1-a.

RECEIVED JAN 31 2008

Yours, etc.

**KAUFMAN DOLOWICH & VOLUCK LLP**
Attorney(s) for
Office and Post Office Address
**135 CROSSWAYS PARK DRIVE, SUITE 201**
**WOODBURY, NEW YORK 11797**
**TELEPHONE (516) 681-1100**
**FACSIMILE (516) 681-1101**

**To**

**Attorney(s)**

**STATE OF NEW YORK, COUNTY OF**

, being duly sworn, deposes and says, that:

☐ deponent is the _____ in the within action; has read the foregoing _____ and knows the contents thereof;

☐ deponent is the _____ of the _____ corporation in the within action; has read the foregoing _____ and knows the contents thereof;

☐ the undersigned is an attorney admitted to practice in the courts of New York, is the attorney of record for the _____ in the within action; has read the foregoing _____ and knows the contents thereof; the same is true to affirmant's own knowledge, except as to those matters said to be upon information and belief and as to those matters, affirmant believes it to be true. This verification is made by affirmant because

The grounds of affirmant's belief as to matters not stated upon affirmant's own knowledge are as follows:

the same is true to deponent's own knowledge, except as to those matters said to be upon information and belief and as to those matters, deponent believes it to be true. The grounds of deponent's belief as to all matters not stated upon deponent's own knowledge are as follows:

Affirmed this _____ day of _____, 20___

_____
*(Print Name Beneath Signature)*

Sworn to before me this _____ day of _____, 20___

_____
*(Print Name Beneath Signature)*

☐ the undersigned is an attorney admitted to practice in the courts of New York and certifies that the within _____ has been compared by the undersigned with the original and found to be a true and complete copy.

Dated _____ day of _____, 20___

_____
*(Print Name Beneath Signature)*

**STATE OF NEW YORK, COUNTY OF**                                    ss:

, being duly sworn, deposes and says, that deponent is not a party to this action, is over 18 years of age and resides at _____ ; that on the _____ day of _____, 20___ deponent served the within

☐ upon _____ personally, by delivering a true copy thereof to h _____. Deponent knew the person served to be the person mentioned and described in said papers.

☐ upon _____ attorney for _____ in this action, at the address designated by said attorney(s) for that purpose by depositing a true copy of same enclosed in a post-paid, properly addressed wrapper, in a post-office/official depository under the exclusive care and custody of the United States Postal Service within the State of New York.

☐ by transmitting the papers by electronic means to the telephone number listed below, which number was designated by the attorney for such purpose. I received a signal from the equipment of the attorney served indicating that the transmission was received. I also deposited a true copy of the papers, enclosed in a post-paid wrapper, in an official depository under the exclusive care and custody of the United States Postal Service, addressed to the attorney at the address set forth after the name.

☐ by depositing a true copy thereof, enclosed in a wrapper addressed as shown below, into the custody of _____ for overnight delivery, prior to the latest time designated by that service for overnight delivery.

Sworn to before me this _____ day of _____, 20___

_____
*(Print Name Beneath Signature)*

Exhibit B

In the Matter of the Arbitration
Between

Local 6, Hotel Restaurant & Club Employees and
Bartenders Union, UNITE-HERE

**AWARD OF**

And

**ARBITRATOR**

The Players Club

**Before: Ira Drogin, Esq., Arbitrator**

For the Union:          Michael D'Angelo, Esq.

For The Players Club:    Regina Faul, Esq.


The undersigned has conducted hearings in this matter on October 30 and
November 26, 2007. After considering all of the evidence and the post-hearing
briefs of both sides, I hereby make the following Award.


## FACTS


The Union and the Players Club ("Club") have been parties to a series of
Collective Bargaining Agreements ("CBA") since February 1, 1989, with the most
recent agreement being a Memorandum of Agreement ("MOA") dated June 7,
2007. The CBA and MOA have been submitted as Joint Exhibit #1. Pursuant to
Schedule "A" of the CBA, bargaining unit work consists of all Food and Beverage
service, (Chef, Sauce Cook, Cook, Pot Washer, Dishwasher, Full and Part-time

Waiters, Captains, Head Bartender and Bartender, Housemen, Night Watchmen, and a Coat Room Attendant). The Club is traditionally closed for Food and Beverage service for the period August 1 through Labor Day. On August 13, 2007, the Club sent a notice to all Food and Beverage service employees as follows:

> On Thursday, August 9, The Players signed an agreement that leases our food and beverage service to Elegant Affairs NY.
>
> Having worked here for the period of time that you have, I'm sure that this development comes as no surprise to you. With the losses that the club has incurred at lunch, in the Grill and in the Dining Room, there was no way that we could continue to provide food and beverage service to our members. This agreement allows Elegant Affairs NY to continue to provide full service to our membership. The Players is no longer in the food and beverage business.
>
> Accordingly, as of August 9, you are no longer in the employ of The Players.
>
> Thank you for your time of service to us and best of luck to you and your family.

This notice was sent approximately six weeks after the Club negotiated and executed its new MOA with the Union, which, among other things, provided for wage increases for the Club's Food and Beverage service employees. It is undisputed that the Club terminated its Food and Beverage operation and entered into an agreement on July 27, 2007, with Elegant Affairs NY, Inc. ("Elegant"), effective August 1, 2007, for Elegant to be the exclusive Food and Beverage provider at the Club, utilizing its own employees.[1] Since then, the Club has continued to function as before as a place of social gathering for Club members and for the public in general, providing Food and Beverage service for its members and guests.

---

[1] This contract will be discussed hereinafter.

## THE APRIL 2006 CONTRACT BETWEEN THE PLAYERS CLUB AND ELEGANT AFFAIRS

The Club and Elegant Affairs entered into a written agreement dated April 6, 2006 ("Agreement"). The term of the Agreement was slightly more than ten years. The Agreement provided that it could be terminated by either party upon written notice. Under its terms, Elegant Affairs was designated as the exclusive caterer at the Club. The parties agreed that Elegant Affairs was to utilize the services of the Club's employees at the events catered by Elegant. The Club was to pay the wages and all fringe benefits for those employees and Elegant Affairs was to compensate or reimburse the Club for the actual cost of the wages and fringe benefits. In addition, the Agreement allowed Elegant Affairs to utilize its own employees in the event that it required additional employees and in such event, Elegant Affairs was to be responsible for all wages and employee benefits for those additional employees.

It is noteworthy that the Elegant Affairs employees were not required to be members of the Union nor was Elegant Affairs to attempt to obtain additional employees from the Union before it could hire additional employees. The Agreement provides that the Club's employees shall remain at all times, employees of the Club and are to be represented for collective bargaining by Local 6. The Agreement expressly states that employees of Elegant Affairs are not represented by any Union.

The Agreement goes on to state that neither party shall be deemed to be a joint employer and that the Club shall be solely responsible for the wages and fund benefits due its employees. The very next sentence provides that employees of Elegant Affairs are not covered by or subject to any collective bargaining agreement and that Elegant Affairs is not responsible for contributions to any Union pension or health and welfare fund. Under this Agreement, Elegant

was to pay the Club a commission based on gross billing of affairs booked and conducted by Elegant.

The Agreement further provides "The Club shall inform the union that represents employees of the Club, as well as those pension and/or health and welfare benefit funds to which the Club make contributions, as to the provisions of this Agreement and shall obtain their acknowledgement and approval of its terms. In the event such approval is not obtained, the Club will provide immediate notice of same to Elegant Affairs." The Club and the Union stipulated that no written notification was given to the Union regarding the terms of the Agreement, and no written approval of the Union was obtained.

There was no evidence whatsoever that the Union was ever made aware of the terms of this Agreement. This is not surprising, as it would be highly unlikely that the Union would grant its approval to a mid-term modification of its CBA that allowed Elegant to bypass the Union by hiring non-Union employees and for Elegant to continue as a non-Union caterer at a Union club. There is also no evidence that the Club provided "immediate notice" to Elegant that such approval had not been obtained from the Union and its related funds.

Although the term of this Agreement was a little bit over ten years, it was superceded sixteen months later by another agreement between the Club and Elegant Affairs.

### THE JULY 2007 AGREEMENT

Effective August 1, 2007, approximately six weeks after the Union and the Club entered into a new MOA, re-adopting the CBA except as modified by the MOA, the Club and Elegant Affairs entered into a twenty-year agreement with

two, five-year automatic renewal provisions with the Club having the right for sixty days prior to the first automatic renewal term, to terminate the Agreement on the terms set forth therein.  A reading of this Agreement indicates that the preceding April 2006 Agreement was in the nature of a trial, during which the Club and Elegant could determine whether or not they could work together, and whether, in doing so, it made financial sense for both parties.  Under the old Agreement, Elegant paid the Club a commission based on gross billings of eight percent (8%) the first and second years, nine percent (9%) during the third year, and ten percent (10%) thereafter.  Undisputed evidence submitted by the Club as well as testimony has established that for many years, the Food and Beverage operation of the Club were running at a substantial loss and that the Club's financial condition, for other reasons, presented a serious difficulty.[2]  It is easily understandable that the Club concluded that contracting out its Food and Beverage operations would be profitable and would greatly reduce its deficit.  Under the 2007 Agreement, Elegant agreed to pay the Club a commission for catered parties based on gross billing and receipts of 8% the first and second years, 9% the third year, 10% thereafter, and beginning in year 6, two percent (2%) of the gross receipts from Food and Beverage and liquor charges of members and their guests.

Once again, Elegant was to be the exclusive Food and Beverage provider at the Club and was to be responsible for servicing the needs of the Club and its members, including lunches, brunches, dinners, and bar operations.  In addition, Elegant was to conduct business and social catering, parties, celebrations, fundraisers, and similar events for the Club, its members and for the general public.  In addition to paying the Club the aforementioned percentages, Elegant was required to pay the Club five hundred thousand dollars ($500,000) for the license to operate Food and Beverage service.  The Agreement required that this

---

[2] The Club's August 13, 2007 termination letter to its Food and Beverage employees also refers to these losses.

sum be dedicated to the Club's payment of some liabilities, not to exceed one hundred thousand dollars ($100,000) and for capital improvements to the building. An initial payment of $100,000 was due within thirty days of signing to be followed by eight annual installments of $50,000 each.

The 2007 Agreement eliminated the Club's former employees from Food and Beverage service. It substituted Elegant as the employer of all Food and Beverage employees and made those non-Union employees subject to the rules and regulations of Elegant. It provided that Elegant shall be solely responsible for the payment of wages, taxes and any employee benefits. The Agreement also contained a request from Elegant that the Club's Board of Directors consider the institution of a monthly/annual Food and Beverage minimum, stating that Elegant believes that such will stimulate member use and goes on to suggest that a possible minimum be imposed on new members admitted to the Club and that the present membership be grandfathered out of said minimum.

It is clear from this contractual history, as well as the financial reports, testimony at the Hearing, and the Club's termination letter to its Food and Beverage employees (which referred to the Club's Food and Beverage losses), that the decision to contract the bargaining unit work out to Elegant was based solely on financial circumstances and the continuing deficit incurred by the Club in its Food and Beverage operations. This deficit was attributed by the Club's financial statements as being due in large part to the Club's labor costs, despite the assertion to the contrary in the Club's brief. The 2007 contract with Elegant was not the result of a decision to change the very nature of the enterprise, nor was it an entrepreneurial consideration affecting the scope and direction of the business enterprise which, according to established labor law does not require decisional bargaining in order to subcontract, but only requires effects bargaining. The Club remains a club for members and guests and for catered

affairs to be run by Elegant at the Club, essentially using the Club's name,
prestige, and physical structures for a profit for Elegant and for the Club. Any
suggestion or claim by the Club that the decision to subcontract was not based
solely on economic motivation is rejected in view of the contractual evidence and
the history of financial problems of the Club. Similarly rejected as not supported
by the evidence, is the claim in the Club's post-hearing brief that the Club
changed the essential nature of its business.

Although the Club claimed at the Hearings and again in its post-Hearing
brief that months prior to the cessation of services and any agreement with
Elegant, the Club advised the Union of its intent to discontinue services and enter
into an agreement with Elegant, no evidence whatsoever has been produced to
support this contention. To the contrary, the Club has admitted that it failed in its
contractual requirement to Elegant, contained in Paragraph #5 of its ten-year
April 2006 contract with Elegant to inform the Union and its related Benefit Funds
of the provisions of the Agreement and to obtain the acknowledgement and
approval of the Union and the Funds as to the terms of the Agreement. There
was no evidence submitted that the possible cessation by the Club of its Food
and Beverage service, or the contracting of that service out, was ever discussed
during the course of the 2007 CBA negotiations. Again, although the Club claims
it informed the Union during the course of the 2007 collective bargaining
negotiations that it intended to, or might contract out its Food and Beverage
operations, no supporting evidence to this effect has been produced by the Club
and the Union claims it was never discussed during collective bargaining
negotiations and that it was "blindsided" by the discharge of all Food and
Beverage employees just weeks after a new Collective Bargaining Agreement
was reached.

## POSITIONS OF THE PARTIES

### ARBITRABILITY

The Club's position is that the dispute is not arbitrable under the terms of the CBA. The Union's position is that the dispute is arbitrable. In its Amended Demand for Arbitration, the Union set forth the issues to be arbitrated as: "Whether the Employer failed to negotiate a mandatory subject of bargaining with the Union concerning the subcontracting of Food and Beverage service to Elegant Affairs NY and the effects thereof and, if so, what shall be the remedy? Whether the Employer violated the terms of the parties' Agreement, including but not limited to the retroactive and termination pay provisions thereof and, if so, what shall be the remedy?"

The arbitration provision contained in the MOA reads as follows: "In the event of any dispute or controversy of any nature whatsoever between the parties or with reference to the interpretation or application of this Agreement the matter, question or dispute, shall be referred to a rotation panel of four (4) arbitrators…the decision of the arbitrator shall be final and binding on the parties hereto."

The above arbitration provision is what is commonly referred to as a broad arbitration clause. It encompasses any dispute or controversy of any nature as well as disputes with regard to the interpretation or application of the Agreement.[3] The Union clearly asks for an interpretation or application of the Agreement when it submits as an issue, whether the Club violated the terms of the parties' Agreement. More specifically, the root of the grievance deals with

---

[3] See Pitta v. Hotel Association of New York City, Inc. 802 F. 2d 419,422 (2d Cir. 1986), Abraham Landau Real Estate v. Bevona, 123 F.3d 69, 74-75 (2d Circ. 1997), Vittoria Corp. v. New York Hotel & Motel Trades Council, 30 F Supp. 2d 431 (SDNY 1998)

the Union's claim that the Club subcontracted its Food and Beverage service to Elegant without negotiating with the Union. This subsumes a claim by the Union that the alleged contracting out violated the CBA. The question of arbitrability is not even a close question. The Union's grievances clearly fall within the authority given the arbitrator by the parties to hear this dispute. The dispute herein calls for the arbitrator to interpret and apply the CBA, in context, and in its entirety to the positions of the parties. The Club's position regarding arbitrability lacks merit and is rejected.

Nor does the Club's claim that it acted as of right by virtue of the Management Rights clause in the CBA preclude arbitration. In Timken Roller Bearing Co. v. NLRB 162 F 2d 949, 20 LRRM 2204 (6th Cir 1947), the employer claimed the right to subcontract under the management rights clause of the CBA. The Court held the dispute "was a dispute as to the interpretation of the management rights clause and the contract specifically provided that such disputes were arbitrable. I too find the disputes herein arbitrable under the CBA.

## MERITS OF THE DISPUTE

The Union claims that the Club has subcontracted bargaining unit work in violation of the CBA. It acknowledges that under the CBA, the Club had the right to totally discontinue Food and Beverage service, but that it did not have the contractual right to discharge its own Food and Beverage employees and to replace them with Elegant's employees, which employees perform the same Food and Beverage service as the Clubs discharged employees. It acknowledges that the Club had the contractual right to lay off employees due to lack of work, but that the action taken by the Club was not a lay off due to lack of work, but was a subcontracting of their work, simply replacing bargaining unit

Union employees with non-Union Elegant employees performing the same bargaining unit work, all in violation of the CBA and of the law.

As a "fallback" position, the Union maintains that at the very least, the Club was required to bargain in good faith, to impasse, regarding the Club's decision to subcontract before subcontracting Food and Beverage operations and that it failed to do so. In addition, it argues that even if the Club had the contractual right to subcontract the bargaining unit work to Elegant, it was required to bargain in good faith with the Union with regard to the effects of the subcontracting, such as preferential re-hiring, recall rights, re-training, etc.

The Union relies on the following contractual provisions in support of its arguments: Sections 2, 3, 10, and 25 of the 1989 CBA, and Section 6 of the 1992 Stipulation (included in Joint Exhibit #1).

The Union finally urges that since the CBA is silent on the issue of subcontracting, at the very least, the Club was obligated to bargain in good faith with the Union to impasse before it could subcontract the Food and Beverage service to Elegant.

To the contrary, the Club's position is that the contractual Management's Rights clause constituted the required bargaining in good faith and also constituted an unequivocal waiver by the Union of bargaining on the subject of subcontracting. The Club's position is that while the CBA does not directly prohibit subcontracting, it contains a Management Rights Clause, which, by not expressly prohibiting subcontracting, allows the Club to subcontract without the necessity of engaging in negotiations with the Union with regard to its decision to subcontract, and, if it does subcontract, that it is not required to negotiate with the Union with regard to the effects of such subcontracting.

The contractual language relied upon by the Club is as follows:

> The Union recognizes that except as expressly limited by
> the terms of this Agreement, the Employer has and retains
> every right including, but not limited to, the right to plan,
> direct and control operations, to hire, to lay off employees
> due to lack of work, to maintain discipline and efficiency
> and to assign work."

The Club reasons that since the aforementioned language preserved every right to the Club, including its right to direct and control operations, and since, according to the Club, there is no express language in the CBA prohibiting or disallowing subcontracting, the Club has the contractual right to subcontract any part of its operations.  It logically follows, according to the Club, that since subcontracting has already been addressed by the parties in the Management Rights clause, and because subcontracting has not been expressly limited by the Agreement, the Club was not required to negotiate its decision to subcontract.

Additionally, posits the Club, the CBA has contemplated the effects of subcontracting in Article IV, Paragraph b of the CBA, which states:  "Nothing herein shall be construed to limit the Employer's right to reduce the number of employees in any classification when warranted by business conditions…" Finally, the Club has submitted documentary evidence in the form of certified financial statements showing that since 2003, the Food and Beverage operations at the Club have operated at a substantial financial loss to the Club, thereby the Club argues it may reduce the number of employees providing Food and Beverage services to zero.

With regard to effects bargaining, the Club points to Article XIII of the CBA – Termination Pay, which states:  "Upon termination of the employment of any employee covered by this Agreement for any reason whatsoever, the Employee

shall be entitled to termination in the following amounts..." Accordingly, argues the Club, the parties contemplated elimination of services and its effects and made provisions for that in the CBA. Therefore, this constitutes a waiver of any right the Union may have had to require the Club to engage in effects bargaining.

## APPLICABLE LAW – GENERAL PRINCIPLES

Both learned and experienced counsel for the parties agree upon a number of general provisions of Labor Law. In general, it is well settled that subcontracting, eliminations, changes in terms and conditions of employment and the loss of work opportunities resulting from such changes are mandatory subjects of bargaining under the National Labor Relations Act ("NLRA"). The bargaining obligation with regard to the decision to subcontract is a mandatory subject of bargaining despite the employer's financial position or its continuing losses in operating Food and Beverage service at the Club, as is the case herein.[4] It is only "core entrepreneurial decisions" that lie outside of the scope of the bargaining obligation. Unilateral action by an employer in subcontracting constitutes a *per se* breach of the NLRA. Waiver of these rights by the Union must be supported by clear and unequivocal evidence of the Union's intent to waive them.

The Board, in considering contractual waiver clauses in which it is claimed that a union has contractually waived its right to bargain, has held: "...a union's right to be notified and consulted concerning any substantial change in employment may be waived by contract, but such waiver must be expressed in clear and unmistakable terms, and will not lightly be inferred." Furthermore, the

---

[4] An emergency exception to the duty to bargain regarding a decision to subcontract is recognized by the law. Under the facts of this case, namely a loss in the Food & Beverage operation, which has been going on for many years and the decision to subcontract that operation for profit rather than eliminate it, that exception is not applicable to this case.

Board reiterated that even where a waiver clause is stated in sweeping terms, it must appear from an evaluation of the negotiations, that the particular matter in issue was fully discussed or consciously explored and that the matter in issue was fully discussed or consciously yielded or clearly and unmistakably waived its interest in the matter. (Eaton, Yale and Towne, 171 NLRB 600, 68 LRRM 1129, 1131 (1968)

Normally, a mere catchall phrase in a management rights clause to the effect that, "all management rights not given up in the contract are expressly reserved to it" falls short of being a clean and unmistakable relinquishment. Proctor Mfg Corp., 131 NLRB 1166, 48 LRRM 1222 (1969).  Contrast this with Allison Corp. 330 NLRB 1363,1365,166 LRRM 1064, 1067 (2000), where the Board held that where a management rights clause "specifically, precisely and plainly" granted the employer the right to subcontract without restriction, there was no obligation to engage in decision bargaining with the union.

It is presently NLRB law that if the employer's decision turned on a reduction of labor costs, the decision would be a mandatory subject of bargaining.  In Fibreboard Paper Prods. Corp v. NLRB 379 US 203 (57 LRRM 2609) 1964, it was held that, "...the type of 'contracting out' involved in this case – the replacement of employees in the existing bargaining unit with those of an independent contractor to do the same work under similar conditions of employment – is a statutory subject of collective bargaining under §8(d)."

It is also clear that a party wishing to make a mid-term modification to a CBA may not unilaterally impose or institute changes in mandatory subjects of bargaining before reaching a good faith impasse in bargaining with the incumbent Union.  Section 8(d) of the NLRA also requires that if an employer seeks to modify the terms and conditions contained in the CBA, Union consent

must be obtained before implementing the change.  If a mandatory subject of bargaining is not specifically covered in a CBA, it is well established that the employer must bargain with the Union with regard to the implementation of such a term and condition of employment.  If however, a subject has been unequivocally waived by the Union, there is no obligation to bargain in good faith to impasse before implementation.

In re Jacobs Mfg. Co. 94 NLRB 1214, (1951), affd. 196 F. 2d 680 (2d Cir 1952), the NLRB held, and its decision was affirmed by the Court of Appeals, that, "…those bargainable issues which have never been discussed by the parties, and which are in no way treated in the contract, remain matters which both the union and the employer are obligated to discuss at any time."  The Board emphasized however:  "And if the parties originally desire to avoid later discussion with respect to matters not specifically covered in the terms of an executed contract, they need only so specify in the terms of the contract itself."  I conclude the management rights clause in the instant case falls short of such specificity.

## THE ISSUES

The Club has submitted certified financial statements showing that its Food and Beverage operations were running at a substantial loss since at least 2003.  The deficit has been as high as about a million and a quarter dollars ($1,250,000) per year, almost all of which has been attributed in the financial statements to labor costs. As a result, the Club certainly had a number of obvious economic options available to it.  Under the CBA, it could reduce its Food and Beverage operation and reduce the number of Food and Beverage employees that it employed.  It could also totally eliminate the Food and Beverage operations altogether and be within its contractual rights.  Additionally,

if the Club chose to do so, it could assess all members a periodic Food and Beverage charge[5] and/or could "grandfather" existing members and assess new members and could consider other means of reducing its losses on Food and Beverage operations.[6]  But, the underlying question here is whether the Club had the right to subcontract its Food and Beverage operations to Elegant.  If it did not, did it first have to negotiate in good faith with the Union to an impasse?  The corollary question if the Club had the contractual right to subcontract is what obligation, if any, did the Club have with regard to effects bargaining.

## DISCUSSION

The first issue is whether the Club subcontracted bargaining unit work.  It is clear, and I find that the Club has subcontracted bargaining unit work to Elegant.  It did not, as it argues, reduce its workforce to zero.  By virtue of its 2007 contract with Elegant, it simply subcontracted the Food and Beverage service out to Elegant.

The next and main issue is whether the Club had the contractual right to subcontract the bargaining unit work.

Both of the parties agree that the CBA between the Union and the Club is unique, as it is tailored to the operations of this particular club.  It is not an Industry Wide Agreement, and the Management's Rights language relied on by the Club was added to the 1989 CBA in 1992.  No previous dispute has arisen between the parties with regard to the application or interpretation of this

---

[5] As suggested by Elegant in the 2007 contract with the Club.
[6] According to the financial statements submitted by the Club, this deficit began to improve as a result of the 2006 Agreement with Elegant Affairs, which resulted in lower labor costs for the Club plus commission income. As a result of the 2007 Agreement with Elegant Affairs, the Club completely eliminated its Food and Beverage labor cost of about nine hundred seventy thousand dollars ($970,000) and replaced those costs with commission income from Elegant Affairs, plus a substantial cash payment to be applied to the Club's deficit.

language, and the history of this dispute shows that the Club continued its unprofitable Food and Beverage operations up until the summer of 2007. Neither side has been able to support their positions with regard to the meaning and application of the Management Rights language to this dispute by way of precedential decisions from this Office involving identical or evenly closely identical contractual language. The present dispute is therefore a matter of first impression.

In considering the meaning and application of contractual language, the intention of the parties in the context of the operation of the business and the concerns of the Union, must be sought. In the instant case, the contract language provides that except as expressly limited by the terms of this Agreement, the employer retains every right. What follows are examples of various exemplary express rights, prefaced by the phrase, "including, but not limited to". Both sides agree that when the MOA was executed in the summer of 2007, some six weeks before the July 27, 2007 Agreement between the Club and Elegant. I find there were no proposals by either side dealing with the subject of subcontracting and I find there was no discussion of subcontracting, even though subcontracting must have been in the mind of the Club, which had contracted with Elegant in 2006, to cater Food and Beverage operations at the Club using the Club's employees, thereby passing on to Elegant the Club's labor costs with regard to events conducted at the Club by Elegant and making a profit on those events under its contract with Elegant. Just when the discussions started between the Club and Elegant that resulted in the July 27, 2007 contract under which all Food and Beverage operations would be performed exclusively by Elegant employees, was not established at the hearing. But it is a fair and logical assumption that because the 2006 Agreement with Elegant proved to be financially beneficial to the Club, contracting out the entire Food and Beverage operation to Elegant was within the contemplation of the Club while it was

engaged in collective bargaining negotiations with the Union, which led to the 2007 MOA. It is also noteworthy that in the 2006 Agreement between the Club and Elegant, the Club was required to give the Union notice of the Agreement and obtain the Union's approval. It is undisputed that the Club did not do so. It seems therefore, that when the Union went into negotiations with the Club, which resulted in the 2007 MOA, the Union was, as it claims, unaware of the direction the Club was moving and the possibility that the Club might subcontract its Food and Beverage operations out, and was in effect, blindsided by the Club's subcontracting that work to Elegant six weeks after the 2007 MOA was agreed to.

The Union relies on certain contractual provisions, the effect of which, it argues, constitute an express limitation on the Club's claim that it has reserved the right to unilaterally subcontract this work. It urges that Article III of the CBA merits consideration regarding the issue. That Article provides among other things, the requirement that the Employer must first apply to the Union to supply it with new employees and if the Union cannot supply the required employees within 48 hours after the Employer has advised the Union to supply such a candidate for employment, the Employer shall have the right to engage such help in the open market.

The Union also points to Article X of the CBA entitled "Replacements", which provides that all new employees shall be hired at the rate of pay for the classifications set forth in Schedule "A" annexed to the CBA.

Also relied on by the Union is Article XXV of the CBA, entitled "Successor Clause", which provides that the Agreement shall be binding upon the Successors and Assigns of the parties, and that no provision, terms, or obligations shall be affected, modified, altered, or changed in any respect

whatsoever by the consolidation, merger, sale, transfer or assignment of either party or affected, modified, altered, or changed in any respect whatsoever by any change of any kind in the legal status, ownership, or management of either party.

The Union also relies on Article 6 of the 1992 Stipulation of Agreement entitled "Emergency Service", which provides that the Employer may utilize employees for "emergency service" but only as a last resort.

A final provision of the CBA relied on by the Union is Article II, "The Recognition Clause", which provides that the employer recognizes the Union as the sole collective bargaining agent for the classifications of employees set forth in Schedule "A".

The Club's argument is that none of the aforementioned common, standard provisions, found in many collective bargaining agreements, trump the express language of the Management's Rights Clause, reserving to the Employer every right except as limited by the terms of the Agreement. It argues that none of the contractual provisions relied upon by the Union expressly limit its right to subcontract. If this argument is accepted, the Club had and has no obligation to bargain with the Union over its decision to subcontract and furthermore, since the CBA provides for termination pay, it has no obligation to engage in effects bargaining.

I find no merit in the Union's argument with regard to the Successors and Assigns provision or the Emergency Service provision. There has been no change in the legal status ownership or management of the Club. Nor does the "Emergency Service" provision, the purpose of which is to clarify and restrict the performance of bargaining unit work by Management of the Club, constitute an express restriction on subcontracting. But, I find that the bargaining unit

recognition clause coupled with the requirements of the CBA that the Club must first apply to the Union to supply it with new employees and that new employees must be hired at the pay rates contained in Schedule A, evidences the intent of the parties that the Club is restricted from eliminating bargaining unit employees and replacing them with the employees of Elegant at Elegant's pay rates. That is the plain impact of what the Club has done and the labels "subcontracting" or "contracting out" are merely descriptive words.

I agree with the rationale and result reached by Arbitrator Hogan in A.D. Juillard Co. 21 LA 713, 724, where he said:

> After a thoughtful consideration of the this question the Arbitrator concludes that the Recognition Clause when considered together with the Wage Clause, the Seniority Clauses, and other clauses establishing standards for covered jobs and employees limits the Company's right to subcontract during the term of the Contract. The Contract sets forth standards of wages and working conditions applicable to those employees and those jobs covered by the Recognition Clause. When the Contract was signed the employees in the mending room were on the covered jobs, and the Contract contemplated that work normally performed by them would continue to be so performed as long as the work was available. To allow the Company, after signing an agreement covering standards of wages and conditions for mending room jobs and employees, to lay off the employees and transfer the work to employees not covered by the agreed standards would subvert the Contract and destroy the meaning of the collective bargaining relation.

## AWARD

## THE REMEDY

I conclude that the Club breached its agreement with the Union and clear NLRB labor law by contracting out its Food and Beverage service to Elegant and discharging its Food and Beverage bargaining unit employees and replacing

them with the subcontractors employees, all without engaging in good faith collective bargaining on the subject with the Union. I find that the management rights clause does not permit the Club to subcontract out bargaining unit work. I find the Club has neither sought nor obtained a mid-term modification of the CBA, nor has it even attempted to bargain in good faith to impasse with the Union on the subject of subcontracting. I find no waiver by the Union of its rights, and I find payment by the Club of "termination pay" is not a substitute for effects bargaining even if the Club had the right to subcontract, which it does not have. I find the Club's breach of contract motivated solely by economic gain from unlawful subcontracting, to the detriment of its long-term employees who have suddenly been cast out of their longtime jobs and replaced by non-Union employees whose lesser cost to Elegant allows Elegant to pay a commission on Food and Beverage service to the club, plus $500,000 over the term of its contract with the Club.

The Club urges that if I find the subcontracting to be unlawful, or violative of the CBA, I apply the "Transmarine" remedy. (Transmarine Navigation Corp. etc 170 NLRB 389, 67 LRRM 1419 (1968)). Transmarine is inapplicable as to remedy as the decision to close the terminal was based "solely on greatly changed economic conditions, to terminate its business and reinvest its capital in a different enterprise in another location as a minority partner..." Under those circumstances, the employer's decision was not a mandatory subject of collective bargaining and only effects bargaining was required, and ordered, tailored to the facts. The only part of Transmarine I find applicable is the NLRB's guidance that, when it is impossible to re-establish a situation equivalent to that which would have prevailed had the employer more timely fulfilled its statutory bargaining obligation, in fashioning an appropriate remedy, we must be guided by the principle that the wrongdoer, rather than the victims of the wrongdoing, should

bear the consequences of their unlawful conduct, and that the remedy should be adapted to the situation that calls for redress.

First:    I order and direct the Club to immediately cease and desist from subcontracting its Food and Beverage service to Elegant Affairs, and to cease and desist from allowing Elegant Affairs to conduct any Food and Beverage operations at the Club with employees of Elegant Affairs.

Second:    If the Club wishes to reinstitute its Food and Beverage service it shall offer reinstatement, in writing, to the employees who it discharged, without loss of seniority and with all benefits, with benefit funds payment and credits from the period between their discharge up to the date of the offer of reinstatement.

Third:    With regard to all employees offered reinstatement due to resumption of Food and Beverage operations, the Club shall make those employees whole for any loss of pay or other lost contractual benefits they may have sustained, less any sum previously paid to such employees as termination pay.

Fourth:    If the Club decides not to provide any Food and Beverage service to its members and/or to the general public, it shall promptly notify the Union of such an intent, in writing, and meet with the Union to negotiate in good faith, the effects of such cessation upon the terminated bargaining unit employees, including but not limited to any loss of income and benefits sustained by those employees, from the date of their termination up to the date the Club notifies the Union of such a decision.  Jurisdiction is retained in the event the

Union and the Club are unable to reach an agreement under this paragraph.

Fifth:      In the event the Club wishes to contract out, or subcontract, any part, or all of its Food and Beverage service, it shall provide the Union with written notice its intent to make a mid-term modification of its agreement with the Union and the parties shall then exercise their rights under applicable law.

Dated:      January 15, 2008
            New York, New York

            IRA DROGIN, an Attorney at Law, licensed to practice in the State of New York, under the penalties of perjury duly affirms that he is the arbitrator described herein, and that he executed the foregoing instrument.

            _____
            ARBITRATOR

Aldine ™ Enviro-Tab ™

**Exhibit C**

Serial #

**41**

Players Club
CBA
Effective 5/1/89
Expires 4/30/92

COLLECTIVE BARGAINING AGREEMENT made and entered

into as of the 1st day of February, ~~1986~~ *89*, by and between THE

PLAYERS, located at No. 16 Gramercy Park, Borough of

Manhattan, City and State of New York (hereinafter referred

to as the "Employer") and the HOTEL, RESTAURANT & CLUB

EMPLOYEES AND BARTENDERS UNION, LOCAL NO. 6, affiliated with

the Hotel and Restaurant Employees and Bartenders Inter-

national Union, and the American Federation of Labor, located

at No. 305 West 44th Street, Borough of Manhattan, City and

State of New York (hereinafter referred to as the "Union").

# W I T N E S S E T H :

WHEREAS, the Employer maintains and operates a

private membership Club; and

WHEREAS, the Union has been duly designated as the

sole collective bargaining agent by the employees of the

Employer; and

WHEREAS, the Employer and the Union recognize this

status and desire to cooperate to stabilize labor relations

by establishing the standards of wages, hours of service and

other conditions of employment, and providing arbitration

machinery, whereby disputes and grievances between the Employer and the employees may be adjusted without resort to strikes, lockouts or other interferences with the continued operation of the business of the Employer.

THEREFORE, the parties mutually agree as follows:

I.  SCOPE OF AGREEMENT

The terms of this Agreement shall apply solely to the classification of employees of the Employer for whom the Union has been designated as the collective bargaining agent, as aforesaid, and the term "employee", as used in this Agreement, shall likewise apply only to those persons employed by the Employer for whom the Union has been so designated.  The aforesaid classification of employees are set forth in Schedule "A" annexed hereto and made a part hereof.

II.  UNION RECOGNITION

The Employer recognizes the Union as the sole collective bargaining agent for the classifications of employees set forth in Schedule "A".

III.  EMPLOYMENT

(a)  The Employer shall apply to the Union to supply it with new employees.  If the Union cannot supply the

required employees within forty-eight (48) hours after the Employer has advised the Union to supply such a candidate for employment, the Employer shall have the right to engage such help in the open market.

(b)  The Union undertakes to supply qualified and competent employees for such vacancies as it may be required to fill.  All new employees shall be engaged for a trial period of up to thirty (30) days.  This trial period is to give the Employer an opportunity to judge the competency of the new employee.  During this trial period, the Employer shall have the right to discharge the employee for any reason whatsoever.  Upon the expiration of the said trial period, the candidate shall be considered a regular employee and come within the terms and provisions of this Agreement.

(c)  Newly engaged employees who are not members of the Union shall become members of the Union no later than sixty (60) days after the date of this Agreement or sixty (60) days after the date of their employment by the Employer, whichever is later, as a condition of employment.  The Union agrees to permit such newly engaged employees, not members of the Union to become members of the Union unless for good cause shown to the Employer, which shall be subject to arbitration if the Employer challenges said cause.

(d)  All employees who are members of the Union at the execution date of this Agreement and all employees who

-3-

shall thereafter join the Union during this contract period,
shall remain members of the Union, as a condition of
employment.  Nonmembers of the Union employed prior to
January 1, 1946, shall not be required to join the Union.

### IV.  TERMINATION OF EMPLOYMENT

(a)  Discharge may be made only for just cause.
The Employer shall have the right without notice to the Union
to summarily discharge any employee for dishonesty, drinking,
physical fighting on the premises or leaving work without
punching out or first obtaining the permission of the
Employer.  The Employer shall notify the Union of its desire
to discharge any employee for any just cause other than those
stipulated above.  If the Union desires to challenge such
discharge, the matter shall be referred to arbitration in the
manner hereinafter provided.  Should the Union also desire to
challenge any discharge summarily made on the grounds above
stipulated, that matter shall likewise be submitted to
arbitration in the manner hereinafter provided.  It is
understood that membership in or activities on behalf of the
Union shall not be grounds for discharge.

(b)  Nothing herein contained shall be construed to
limit the Employer's right to reduce the number of employees
in any classification when warranted by business conditions.
In the event that the Union prefers to invoke a share-the-

-4-

work plan instead of effecting any layoffs, the Employer agrees to work out such arrangement, provided it shall mean no extra expense to the Employer, and shall not cause any hardship on the Employer.

V.   COMPENSATION, HOURS AND DAYS OF WORK, OVERTIME AND MEALS

(a)   Full-time employees shall work a five (5) day, thirty-five (35) hour work week, and the work day for said employees shall be seven (7) hours per day.  Part-time employees shall work a five (5) day, seventeen and one-half (17-1/2) hour work week.  The work day for part-time employees shall be three and one-half (3-1/2) hours per day. Employees presently working less than the foregoing hours shall continue to do so.  All work done by employees in excess of the foregoing work week or work day shall be paid for at overtime rate.

(b)   All employees shall receive meals without cost.

(c)   (i)   Effective as of and retroactive to the 1st day of May, 1989, all full-time employees shall receive a wage increase of Nineteen Dollars ($19) per week.  Effective May 1, 1990, said employees shall receive an additional wage increase of Twenty Dollars ($20) per week.  Effective May 1, 1991, said employees shall receive a further wage increase of Twenty-One Dollars ($21) per week.

(ii)    Effective as of and retroactive to the 1st day of May, 1989, all part-time employees shall receive a wage increase of Nine Dollars and Fifty Cents ($9.50) per week.  Effective May 1, 1990, said employees shall receive an additional wage increase of Ten Dollars ($10.00) per week. Effective May 1, 1991, said employees shall receive a further wage increase of Ten Dollars and Fifty Cents ($10.50) per week.

(d)    Annexed hereto and made a part hereof is Schedule "A", which contains the minimum wages to be paid to the employees for the duration of this Agreement.  New employees for the first forty-five (45) working days of their employment shall be paid no less than the wage applicable for the immediately preceding contract year.

VI.  VACATIONS

(a)  All employees employed by the Employer six (6) months but less than one (1) year, shall receive 6 days vacation with pay.  All employees employed by the Employer one (1) year but less than six (6) years, shall receive eleven (11) days vacation with pay.  All employees employed by the Employer six (6) years but less than fourteen (14) years,  shall receive sixteen (16) days vacation with pay. All employees employed by the Employer fourteen (14) years but less than twenty-five (25) years shall receive twenty-one

(21) days vacation with pay.  All employees employed by the Employer twenty-five (25) years or more shall receive twenty-five days vacation with pay.

An allowance for meals to the extent of Fifty Cents ($.50) per day shall be added to the vacations herein provided for the vacation period.

(b)  The employer agrees to effect a rotation of employees during the summer months so as to provide an extra day off without deduction of pay, provided such rotation would not interfere with the normal business of the Club.

An employee whose employment is terminated for any reason shall be paid a prorated vacation based upon the anniversary date of employment.

VII.  HOLIDAYS

Employees shall be paid a double day's pay for a full day's work, or pro rata, for work performed on the following twelve (12) legal holidays:

| | |
|---|---|
| (Memorial) Decoration Day | Labor Day |
| Thanksgiving | Columbus Day |
| Friday after Thanksgiving | Good Friday |
| Christmas | Lincoln's Birthday |
| New Year's Day (January 1) | Washington's Birthday |
| July 4th | Martin Luthur King Day |

and two (2) Personal Days or, at the option of the Employer, a day off may be given in lieu of the double day's pay.

-7-

## VIII.   SHOP CHAIRMAN

The employees shall be entitled to elect a Shop Chairman who shall be recognized by the Employer.  All grievances and complaints of the workers shall be referred to this Chairman so that they may be presented in an orderly and regular manner to the Manager of the Club, or his designated representative.  In the event the Shop Chairman and the Manager cannot adjust any matter, then in that event, the Manager shall be required to discuss the same with the Union officials.  In the event that the matter cannot then be amicably adjusted, it shall be submitted to arbitration, as hereinafter provided.  The Employer consents that the Shop Chairman shall be permitted to inquire of all Union members as to their good standing in the Union, including question of Union dues and assessments.

## IX.   OFFICIAL VISITS

At any reasonable time, an officer, representative, delegate or a committee of the Union, bearing proper credentials, shall have the right to visit the Employer's place of business.  It is agreed, however, that these visits shall in no manner interfere with the normal administration of the business of the Employer.

X.  <u>REPLACEMENTS</u>

All new employees shall be hired at the rate of pay for the classification in which such employee falls as set forth in Schedule "A" annexed hereto.

XI.  <u>UNION ACTIVITY</u>

Employees shall not conduct Union activities during working hours.

XII.  <u>UNIFORMS AND LAUNDRY</u>

The Employer agrees that it will furnish, launder and maintain without charge to the employees, all wearing apparel and uniforms required by it of the employees.  The cook's uniform shall consist of a jacket, trousers, apron and cap.

XIII.  <u>TERMINATION PAY</u>

Upon termination of the employment of any employee covered by this Agreement for any reason whatsoever, the employee shall be entitled to termination pay in the following amounts:  Any employee covered by the Agreement who is permanently laid off after having been in the employ of the Employer for two (2) years or more, shall be paid one (1) week's severance pay for each year of employment.

XIV.  GROUP INSURANCE

The parties have established and shall continue to effect a group life, health and accident social security plan.  This plan provides for:

(a)  1.  A life insurance policy for each employee in the face sum of Two Thousand Five Hundred Dollars ($2,500.00), effective May 1, 1990.  Said policy shall be increased, as of May 1, 1991, in face value to Five Thousand Dollars (5,000.00).

2.  In the event that after twenty (20) years' service with the Employer an employee retires at age sixty-two (62) or later, the Employer agrees to maintain life insurance in the amount of Two Thousand Five Hundred Dollars ($2,500.00) for such employee for the remainder of his life.

(b)  A weekly benefit for sickness or disability resulting from non-occupational accidents starting with the eighth day and continuing for twenty-six (26) consecutive weeks.  This benefit shall be in the amount of one-half (1/2) the employee's average weekly wage with a minimum of Twenty Dollars ($20.00) per week, except that if an employee's average weekly wage is less than Twenty Dollars ($20.00) a week, said employee shall receive as a weekly benefit the employee's weekly wage.

(c)  All employees covered by this Agreement shall be provided Blue Cross hospitalization for the employee and

-10-

for the immediate members of his or her family. Said Blue Cross coverage shall be for one hundred twenty (12) full benefit days and shall be paid for by the Employer.

(d)    The Employer shall contribute to the Hotel and Club Employees' Union, Local 6 Insurance Fund on behalf of each of the employees covered by this Agreement sufficient money to enable said Insurance Fund to purchase Health Insurance Plan of Greater New York (H.I.P.) or Group Health Insurance (G.H.I.) coverage for each such employee and the immediate members of his or her family.

The Employer agrees to be a party to and bound by the Amended Agreement and Declaration of Trust establishing the Hotel and Club Employees Union Local No. 6 Insurance Fund entered into by the Union and other Employers as of January 26, 1962. The Employer agrees that the benefits payable to its employees thereunder shall be paid in accordance with the Rules and Regulations promulgated by the Trustees of said Fund.

(e)    The H.I.P. and the Blue Cross hospitalization provided for each employee pursuant to subdivisions (c) and (d) of this Article shall be in addition to the benefits presently being received by employees in the form of sick or disability benefits, hospitalization, insurance benefits and the like, provided, however, that the Employer may, in its discretion, withdraw from said employees any such benefits

-11-

which are duplicated by H.I.P. and Blue Cross hospitalization.

The Employer agrees to pay to its employees receiving either disability benefits or Workmen's Compensation Benefits the difference between the employees' basic wages under this Agreement and the compensation received by the employees under the Disability Benefits Law or the Workmen's Compensation Law, as the case may be, for a period up to twenty-six (26) weeks.

(f)    Scholarship Fund

(i)    Effective May 1, 1990, the Employer agrees to accept and become a party to an Agreement and Declaration of Trust, which Agreement shall provide for the establishment of a jointly-trusteed fund, the purpose of which is to provide college scholarships to dependents of the Employer's employees, the selection of which shall be made by an independent committee of educators.

(ii)    Effective May 1, 1990, the Employer shall contribute, monthly for the duration of this Agreement, One ($1.00) Dollar per employee.  Said contribution shall be remitted on or before the 13th day of each month.

(g)    The Employer further agrees to be bound by any amendment to the Trust Indenture which the Trustees, in their sole discretion, may pass authorizing the merger and/or common administration of the Club Employees Insurance Funds

-12-

with the New York Hotel & Motel Trades Council and Hotel
Association of New York City Inc. Benefit Funds.

## XV.   PENSIONS

(a)  The Employer is a party to the Agreement and
Declaration of Trust of the Club Employees Pension Fund dated
the 28th day of October, 1955, and any amendments thereto.

(b)  The Employer shall contribute, as of May 1,
1989, monthly a sum equal to six and one-half per cent (6-
1/2%) of the gross wages of the employees covered by this
Agreement.  The said contributions shall be remitted on or
before the 10th day of each month to the Club Employees
Pension Fund.

(c)  The Trustees of the Club Employees Pension
Fund shall have the right to request records from the
Employer with respect to wages ad employment, and shall have
the right to examine said wage and employment records through
duly authorized representatives,, including certified public
accountants.

(d)  The Union in its name, or the Club Employees
Pension Fund, may institute an action or intervene in any
proceedings at law, equity or bankruptcy, for the purpose of
collecting any sums due to the Pension Fund.

(e)   The Employer further agrees to be bound by any amendment to the Trust Indenture which the Trustees, in their sole discretion, may pass authorizing the merger and/or common administration of the Club Employees Pension Fund with the New York Hotel & Motel Trades Council and Hotel Association of New York City, Inc. Pension Fund.

XVI.   DENTAL BENEFITS

(a)   The employer is a party to the agreement and Declaration of Trust, establishing a Dental Fund under the Local 6 Insurance Fund.

(b)   The Employer shall continue to contribute monthly for the duration of this agreement, a sum equal to two per cent (2%) of the gross wages of the employees covered by this agreement.   The said contributions shall be remitted to the Local 6 Insurance Fund on or before the 10th day of each month.

(c)   The Trustees of Local 6 Insurance Fund shall have the right to request records from the Employer with respect to wages ad employment, and shall have the right to examine said wage and employment records through duly authorized representatives, including certified public accountants.

(d)   The Union in its name, or the Fund, may institute an action or intervene in any proceedings at law,

equity or bankruptcy, for the purpose of collecting any sums
due to the Pension Fund.

### XVII.  SICK LEAVE

(a)  Each employee is entitled to a maximum sick
leave of six (6) days per calendar year, which shall accrue
at the rate of one-half (1/2) day per full month of
employment.

(b)  No sick leave shall be granted to an employee
unless he has completed the required probationary period; on
the understanding that upon completion of the probationary
period, each employee shall be entitled to retroactive credit
for sick leave.

(c)  Sick leave may be used only for absences due
to actual illness of the employee.  Notification of absence
due to illness should be made by the employee on each
scheduled work day as early as possible (i.e., within the
first two hours of the working day; i.e., between 8:00 a.m.
and 10:00 a.m.) to the Employer's manager or if the manager
is not available, then to the Employer's switchboard.  If the
employee is able to ascertain that the illness will exceed
one day at the time that he or she communicates with the
Employer, he or she should notify the Employer as to the full
extent of such anticipated absence.

(d)   Employees may be asked to submit a medical certificate or other similar evidence to substantiate the fact of illness after (i) two or more consecutive days of absences, or (ii) in cases where an employee has excessive absence, or a pattern of absences, or (iii) to substantiate the event of illness on the first regular work day before or after a holiday.

(e)   On or Before January 15 of each calendar year during which this Agreement is in effect, the Employer shall pay to each employee, at his or her regular rate of pay in effect on February 1 of the preceding contract year, an amount equal to one (1) day's pay for each unused day of sick leave accrued during the preceding calendar year so long as the employee was on the Employer's payroll on December 31 of the previous calendar year.

## XVIII.   PREVAILING BENEFITS

Nothing herein contained shall be so construed as to deprive the employees of receiving benefits that have heretofore been granted to the employees.

## XIX.   SENIORITY PRINCIPLE AND LEAVES OF ABSENCE

(a)   The seniority principle with respect to promotions, layoffs and all other aspects of the employment relationship shall be followed whenever practicable.   In the event that the employee to be laid off according to seniority

principles is necessary for the Employer's business, the Union will not insist on the seniority principle being applied.

(b)  The Shop Chairman and the Assistant Shop Chairman (who will be chosen by the Shop Chairman) shall enjoy top seniority in their job classifications for purposes of lay-offs so as to insure continuous representation of the unit.

(c)  The Employer agrees that any employee who has been in its employ for five (5) or more years, shall be entitled upon the request of said employee, to a three (3) months' leave of absence which shall be granted within a reasonable time after the request is made. The exercise of this right to a leave of absence by any employee shall in no way impair any seniority rights which said employee had at the time of taking such leave.

## XX.   STRIKES AND LOCKOUTS

During the term of this Agreement, there shall be no strikes, stoppages, slowdowns or other forms of cessation of normal work on the part of the employees and the Union, and no lockouts on the part of the Employer.

## XXI.   SYMPATHY STRIKES

Notwithstanding any other provision which may be contained in this Agreement to the contrary, it is expressly

-17-

understood and agreed that in the event of any dispute or
controversy involving the Employer and any other organization
concerning the employment of other help or the handling, sale
or distribution of merchandise in the establishment of the
Employer, the Union reserves the right to withdraw its
members from work, and such withdrawal shall not be deemed a
breach of this agreement.

### XXII.   ARBITRATION

In the vent of any dispute or controversy of any
nature whatsoever between the parties or with reference to
the interpretation or application of this Agreement, the
matter, question or dispute shall be referred to an
arbitrator to be designated by the New York State Board of
Mediation, pursuant to its rules and regulations.   The
decision of the arbitrator shall be final and binding on the
parties hereto.

### XXIII.   JURY DUTY

Any employee who serves on a jury shall be
reimbursed by the Employer during the first two (2) weeks of
such jury service for the difference between his (her) wages
and jury pay.

### XXIV.  COLLECTION OF UNION DUES

The Employer agrees to deduct initiation fees, dues
and assessments duly established by the By-Laws and Rules of
the Union from the wages of the respective employees monthly.
The Union agrees to furnish the Employer with a memorandum
showing the amount of initiation fees, dues and assessments,
due from its employees as members of the Union.  The Employer
agrees, after such deductions, to transmit such sums
collected by it to the Union not later than the fifth (5th)
day of the month following the month of collection.  The
Employer agrees to furnish to the Union a list of the
employees in its establishment covered by the Agreement and
to supplement such list from time to time to indicate the
names of all new employees.  The Employer will also notify
the Union of employees who have left the employ of the
Employer.

### XXV.  SUCCESSOR CLAUSE

This Agreement shall be binding upon the successors
and assigns of the parties hereto, and no provision, terms or
obligations herein contained shall be affected, modified,
altered or changed in any respect whatsoever by the
consolidation, merger, sale, transfer or assignment or either
party hereto or affected, modified, altered or changed in any

respect whatsoever by any change of any kind in the legal status, ownership or management of either party hereto.

XXVI.   PRIVATE FUNCTIONS

The parties agree that the wages paid to employees working private functions shall be increased according to the "Players Club Banquet Agreement"  (Schedule "B" attached).

XXVII.   DURATION

(a)  This Agreement shall be effective as of the 1st day of May 1989, and shall continue in full force and effect until the 30th day of April, 1992.

(b)  Thirty (30) days prior to the said expiration date, the Employer and the Union shall confer in order to commence negotiation for the terms and conditions of employment for the next succeeding contract period.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals the day and year first above written.

THE PLAYERS

By: _____

HOTEL, RESTAURANT & CLUB EMPLOYEES
AND BARTENDERS UNION, LOCAL NO. 6

By: _____

By: _____

By: _____

SCHEDULE "A"

| | May 1, 1989 | May 1, 1990 | May 1, 1991 |
|---|---|---|---|
| Chef | 463.00 | 483.00 | 504.00 |
| Sauce Cook | 401.00 | 421.00 | 442.00 |
| Cook | 376.00 | 396.00 | 417.00 |
| Pot Washer | 332.00 | 352.00 | 373.00 |
| Dish Washer | 329.00 | 349.00 | 370.00 |
| Waiter (Full Time) | 354.00 | 374.00 | 395.00 |
| Waiter (Part Time) | 181.00 | 191.00 | 201.50 |
| Housemen | 329.00 | 349.00 | 370.00 |
| Nightwatchman | 343.00 | 363.00 | 384.00 |
| Head Bartender | 387.00 | 407.00 | 428.00 |
| Bartender | 382.00 | 402.00 | 423.00 |
| Coatroom Attendant | 358.00 | 378.00 | 399.00 |
| Captain | 395.00 | 415.00 | 436.00 |

## SCHEDULE "B"

1.  As of May 1, 1989, waiters performing service for 3-1/2 hours lunch function shall receive $51.50 up to 15 covers.  The rate as of May 1, 1990 shall be increased to $53.00 and as of May 1, 1991 increased to $55.50.

2.  Waiters performing service for 4-1/2 hours dinner functions shall receive $62.50 up to 15 covers.  The rate as of May 1, 1990 shall be increased to $65.00 and as of May 1, 1991 increased to $67.50.

3.  If a waiter does not show up, the remaining waiters shall receive $3.00 for each extra cover they serve.

4.  Waiters setting up and clearing off shall receive an extra $13.00 per function.

5.  Setting up or clearing off shall consist of 30 covers.

6.  The normal amount for a dinner buffet taken care of by a waiter shall be 25.  In the event that due to an increase in the function, or failure of waiters reporting for work, for each 25 covers, the employer shall divide equally the proper amount of moneys among the waiters servicing the function.

7.  When a party is scheduled for over 100 people the Club shall employ an extra dish washer whose pay shall be $56.50.  (5/1/90 - $59.00) (5/1/91 - $61.50).

8.  Extra lunch bartenders shall be paid $51.50 for 3-1/2 hours function.  (5/1/90 - $54.00)  (5/1/91 - $56.50).

For the Club

For the Union

Serial #

42

Players Club
Stipulation of
Effective  5/1/92
Expires   6/30/96

## STIPULATION OF AGREEMENT

IT IS HEREBY STIPULATED AND AGREED by and between Local 6 Hotel,
Restaurant & Club Employees and Bartenders Union and THE PLAYERS that the
following terms have been negotiated and shall be incorporated in a
successor collective bargaining agrement:

1.  <u>Term of the Agreement</u>:  May 1, 1992 to June 30, 1996.

2.  <u>Wages</u>:  The increases to the wages contained in the current
agreement shall be as follows:

| | | |
|---|---|---|
| May 1, 1992 | — | $19.00 |
| November 1, 1993 | — | $20.00 |
| May 1, 1994 | — | $21.00 |

3.  <u>Grievance Procedure</u>:  The grievance procedures shall be as set
forth in Exhibit A annexed hereto.

4.  <u>Management Rights</u>:  The management rights clause of the collective
bargaining agreement shall be as set forth in Exhibit B annexed hereto.

5.  <u>Dental Fund</u>:  The Employer shall make contributions into the Club
Employees Dental Fund.  Such contributions shall be calculated on the base
wages of each employee and shall be Two per cent (2%) thereof.

6.  <u>Emergency Service</u>:  The Employer may utilize employees for
"emergency service" but only as a last resort.  It is understood and
agreed that the use of employees for said emergency service shall be
discussed between the Union, the

employees and the Employer on the day following such emergency service to determine if an emergency actually existed and if any additional compensation is due for said services.  In the event, the parties cannot agree, the dispute shall be resolved through arbitration.

7. __Termination Pay__:  It is understood and agreed that an employee who has been discharged, and is found, after final and binding arbitration, to have been discharged for "just cause" is not entitled to receive termination pay and management shall not be obligated to make such payments.

8. __No Lockout/No Sympathy Strike__:  During the term of the Agreement there shall be no sympathy strikes or any other Union activity directed against the business interests of operations of the Employer predicated upon a dispute between the Employer and any third-party.  The Employer agreed that during the term of the Agreement there shall be no lock-outs.  The Union agrees to cooperate with the Employer in every way possible to seek prompt discontinuance of any indicated or actual violation of this provision.  The Union reserves the right to withdraw its members from the Employer's premises in the event the Employer's refusal to proceed to arbitration as provided herein. No employee may be discharged or otherwise disciplined from refusing to cross a picket line that may be placed in front of the Employer's establishment. (32)

9. __Schedule B__:  See Attached.

- 2 -

10.    <u>Study committee</u>:  The parties agree to fully cooperate and/or participate in any study committee authorized by the Club Insurance Fund Board of Trustees to review and recommend alternative methods of providing medical coverage to its members and employees.

## SCHEDULE "B"

1. Waiters preforming service for 3-1/2 hours lunch function shall received $57.50 up to 15 covers as of May 1, 1992. (11/1/93 – $59.50) (5/1/94 – $61.50)

2. Waiters preforming service for 4-1/2 hours dinner function shall received $69.50 up to 15 covers as of May 1, 1992. (11/1/93 – $71.50) (5/1/94 – $73.50)

3. If a waiter does not show up, the remaining waiters shall receive $4.00 for each extra cover they serve as of May 1, 1992. (11/1/93 – $5.00) (5/1/94 – $6.00)

4. Waiters setting up and clearing off shall receive an extra $13.00 per function as of May 1, 1992. (11/1/93 – $15.00) (11/1/94 – $16.00).

5. Setting up or clearing off shall consist of 40 covers.

6. The normal amount for a dinner ~~buffet~~ taken care of by a waiter shall be 30.   In the event that due to an increase in the function, or failure of waiters reporting for work, for each 30 covers, the employer shall divide equally the proper amount of moneys among the waiters servicing the function.

7. When a party is scheduled for over 100 people the Club shall employ an extra dish washer whose pay shall be $61.50.

8. Extra lunch bartenders shall be paid $56.50 for 3-1/2 hours function.


For the Club

For the Union

aug 17 82

– 4 –

## MANAGEMENT RIGHTS

The Union recognizes that except as expressly limited by the terms of this Agreement, the Employer has and retains every right including, but not limited to, the right to plan, direct and control operations, to hire, to lay off employees due to lack of of work, to maintain discipline and efficiency and to assign work.

## DELEGATE AND GRIEVANCES

The employees shall be entitled to elect a Delegate who shall be recognized by the Employer.  All grievances and complaints of the workers shall be referred to this Delegate, so that they may be presented in an orderly and regular manner in accordance with the Grievance procedure set forth in Article XXXI.

## GRIEVANCE AND ARBITRATION

A.  Adjustment of all complaints, disputes, controversy and grievances of any kind or nature arising between the Employer and the Union concerning the interpretation, operation, application, or performance of the terms of this Agreement or any complaint, dispute, controversy, or grievance involving a claimed breach of any term or condition of this Agreement shall be undertaken in accordance with the following procedure:

Step 1- Within 30 days of the occurence of the event giving rise to a grievance, the employee having a grievance and/or his/ her Union delegate or his/her representative shall take up the grievance with his/her immediate supervisor.  The Employer shall give its answer to the employee and his/her Union delegate or other representative within ten (10) working days after the presentation of the grievance.

Step 2- If a grievance is not settled in Step 1, the grievance

may, within ten (10) working days after the answer to Step 1, be presented in Step 2.  When grievances are presented in Step 2, they shall be reduced to writing, signed by the grievant and his/her Union representative and presented to the Employer's Director who shall render a decision in writing within ten (10) days after the presentation of the grievance in this step.

Failure on the part of the Employer to answer a grievance at this or any other step shall not be deemed acquiescence thereto and the Union may proceed to the next step.

Any disposition of the grievance from which no appeal is taken within the time limits specified herein shall be deemed resolved and shall not thereafter be considered subject to the grievance and arbitration provisions of this Agreement.

Step 3- A grievance which has not been resolved hereunder may within fifteen (15) working days after the completion of Step 2 of the grievance procedure, be referred for arbitration by either the Employer or the Union to an arbitrator selected in accordance with the procedures of the American Arbitration Association.. The arbitration shall be conducted under the voluntary labor arbitration rules then prevailing by the American Arbitration Association.

Fees and expenses of the American Arbitration Association and the Arbitrator shall be borne equally by the parties.

The decision of the Arbitrator hereunder shall be final and binding upon the Employer, the Union and the employee.  The Arbitrator shall not under any circumstances have power to add to, subtract from, or modify any of the terms of this Agreement.

The time limits herein may be extended by mutual writeen agreement of the parties.

Serial #

43

Players  Club
Stipulation of
Effective  7/1/96
Expires   7/1/2001

## STIPULATION  OF  AGREEMENT

**It is hereby stipulated** and agreed by and between HOTEL, RESTAURANT & CLUB EMPLOYEES AND BARTENDERS UNION, LOCAL6, AFL-CIO and the PLAYERS CLUB that the following terms have been negotiated and shall be incorporated  in the successor  collective bargaining agreement:

1.    <u>Term of the Agreement</u>  July 1, 1996 to July 1, 2001.

2.    <u>Wages</u>  The increases to the wages contained in the current agreement shall be as follows:

| | |
|---|---|
| July 1, 1996 | $16.00 |
| July 1, 1997 | $16.00 |
| July 1, 1998 | $16.00 |
| July 1, 1999 | $16.00 |
| July 1, 2000 | $16.00 |

2.    The deletion of the holiday "Lincoln's Birthday."  The change of "Washington's Birthday" to "President's Day."

3.    The increase in the number of Personal Days from two to three.

## SCHEDULE  "B"

1. Waiters performing service for 3 and 1/2 hours lunch function shall receive as of July 1, 1996, $63.22;  July 1, 1997, $64.94;  July 1, 1998, $66.66;  July 1, 1999, $63.38;  July 1, 2000, $70.10.

2. Waiters performing service for 4 and 1/2 hours dinner function shall receive for twenty covers:  July 1, 1996, $75.22;  July 1, 1997, $76.94, July 1, 1998, 78.66;  July 1, 99, $80.38;  July 1, 2000, $82.10.

3. If a waiter does not show up, the remaining waiters shall receive $6.00 per cover.

4. Buffet covers will be 30 covers. Waiters setting up and clearing off shall receive an extra $16.00. Setting up and clearing off shall consist of 40 covers.

5. The normal amount for a dinner buffet will be 30 covers in the event that due to an increase in the function, or failure of waiters reporting for work, for each 30 covers the employer shall divide equally the proper amount of monies among the waiters servicing the function.

6. When a party is scheduled for over 100 people the Club shall employ an extra dishwasher whose pay shall be $61.50.

7. Extra luch bartenders shall be paid $56.50 for 3 and 1/2 hours function.

8. Medical Article XIV shall be amended to provide each employee with Oxford medical insurance, 120 days for each employee's spouse and all eligible unmarried children under 19 years of age. All at the Club's expense with the exception of a $5 copayment for an employee's doctor visit.

_Jan 30-97_

Hotel, Restaurant & Club Employees
and Bartenders Union, Local 6, AFL-CIO

The Players ~~Club~~

2/10/97

## MEMORANDUM OF AGREEMENT

Memorandum of Agreement made this 1st day of October, 2001, by and between the

Players (the "Club" or "Employer") and the Hotel, Restaurant & Club Employees and Bartenders

Union Local 6, HEREIU, AFL-CIO (the "Union").

Except as modified below, the terms and conditions of the Parties' collective bargaining

agreement, which expired on April 30, 1992, and which was modified and extended by a Stipulation

of Agreement dated August 17, 1992, and was further modified and extended by a Stipulation of

Agreement dated February 10, 1997, shall continue.

1. <u>Duration</u>  Delete Article XXVII, Section (a) and replace with:

    The Agreement shall be effective as of July 1, 2001 and shall continue in full force

    and effect up to and including midnight June 30, 2006.

2. <u>Retroactive Pay</u>  The wage increases provided for below shall be retroactive to July

1, 2001.

3. <u>Wages</u>  Delete Article V, Section (c) and replace with:

    (i)    All full-time employees shall receive weekly wage increases as follows:

    | | |
    |---|---|
    | Effective July 1, 2001 | $17.00 |
    | Effective July 1, 2002 | $18.00 |
    | Effective July 1, 2003 | $19.00 |
    | Effective July 1, 2004 | $19.00 |
    | Effective July 1, 2005 | $19.00 |

    (ii)    Part-time employees shall be paid weekly wage increases on a pro-rated basis,



based on the hours worked and according to the job classification rates provided for in Schedule A.

(iii)    Effective July 1, 2001, Kitchen Steward/Storeroom Attendant Joseph Laguerre shall receive a weekly wage increase of $67.00. Thereafter, the Kitchen Steward/Storeroom Attendant shall receive weekly wage increases in accordance with paragraph 3(i) of this Agreement.

4.    Delete Section 2 of Schedule B and replace with:

Effective July 1, 2001, Waiters performing service for 4-1/2 hours dinner function shall receive $104.00 for up to 20 covers.

5.    Delete Articles XIV (Group Insurance), XV (Pensions) and XVI (Dental Benefits) and replace with:

## ARTICLE XIV
## GROUP INSURANCE

(a)    The Employer shall begin to contribute each month to the New York Hotel Trades Council and Hotel Association of New York City, Inc. Health Benefits Fund (the "Health Benefits Fund") (the successor to the New York Hotel Trades Council and Hotel Association of New York City, Inc. Union Family Medical, Insurance and Dental Funds) a sum equal to six and three quarters percent (6.75%) of the wages of each employee covered by this Agreement for coverage under the medical benefits program portion of the Heath Benefits Fund. The Employer shall also begin to contribute each month to the Health Benefits Fund sums equal to seven and three quarter percent (7.75%) of the wages of each such employee and two percent (2%) of the wages of each such employee for coverage under the hospital and insurance benefits program portion and the dental benefits program portion, respectively, of the Health Benefits Fund. The Employer shall remit its contributions on or before the tenth (10th) day of each month.



(b)     It is expressly agreed and understood that if, during the term of this Agreement, the monthly contribution rate(s) to the Health Benefits Fund shall be increased under the terms of the Industry-Wide Collective Bargaining Agreement between the New York Hotel Trades Council, AFL-CIO and the Hotel Association of New York City, Inc. (the "Industry-Wide Agreement"), such increased rate(s) shall automatically apply to the Employer upon receipt of written notice from the Trustees of the Health Benefits Fund. In this regard, the Employer acknowledges that, under a Memorandum of Understanding dated June 15, 2000 which amends the Industry-Wide Agreement and extends it to June 30, 2006, the percentage rate of contribution for the combined medical benefits, hospital and insurance and dental benefits programs increase by one percent (1%) effective January 1, 2003, from sixteen and one-half percent (16.5%) to seventeen and one-half percent (17.5%). It is further expressly agreed and understood that the IWA requires the Trustees of the Health Benefits Fund to maintain projected liquid assets of the Fund at the end of each calendar year at not less than forty-five percent (45%) of the following year's expenses.

For the purposes of calculating contributions to the Health Benefits Fund under this Agreement, the term "wages," as defined in the Industry-Wide Agreement, shall be used. Therefore, "wages" includes overtime pay, vacation pay, holiday pay, sick leave pay, personal day pay, jury duty pay, military leave pay, family leave pay, bereavement pay, value of meals and lodgings where such are part of an employee's wages commencing from the first day of employment, whether such employment is on a regular full or part-time, casual, temporary, banquet or extra basis.

(c)     The Employer hereby adopts and agrees to be bound, and to abide by, all of the terms and conditions of the Health Benefits Fund's Agreement and Declaration of Trust, including the Audit Guidelines and Collection Procedures promulgated by the Trustees of the Health



Benefits Fund pursuant thereto, and the Health Benefits Fund's Summary Plan Description, as they each presently exist or as they each may hereafter be amended or modified and any interpretations of any of the foregoing. The Health Benefits Fund's Agreement and Declaration of Trust, Audit Guidelines and Collection Procedures and Summary Plan Description are all incorporated herein by reference.

(d)    The Employer hereby agrees to execute any additional documents which may be prescribed by the Trustees of the Health Benefits Fund to effectuate and continue the Employer's participation as a contributing employer with respect to such Fund.

(e)    For those employees on the Employer's payroll as of July 1, 2001, the Employer agrees that in the event after twenty (20) years' service with the Employer the employee retires at age sixty-two (62) or later, the Employer agrees to provide and maintain a life insurance policy for that employee in the amount of Five Thousand Dollars ($5,000.00) for the remainder of the employee's life.

(f)    The Employer shall begin making monthly contributions to the Health Benefits Fund in the sum of Three Dollars and Forty-Five Cents (S3.45) for each employee covered by this Agreement, to provide benefits under the optical benefits program of the Health Benefits Fund. Said contributions shall be remitted on or before the tenth (10th) day of each month.

## ARTICLE XV
### PENSIONS

(a)    The Employer hereby adopts and agrees to be bound, and to abide by, all the terms and conditions of the Agreement and Declaration of Trust of the Club Employees Pension Fund dated October 28, 1955 and agrees to accept and become a party to any amendments thereto.



(b)    The Employer shall contribute monthly for the duration of this Agreement to the Club Employees Pension Fund a sum equal to six and one-half (6.5%) percent of the base wages paid to the regular employees (but not extra or temporary employees) covered by this Agreement, i.e., regular straight-time earnings for a five (5) day week, excluding bonuses, overtime earnings and other premium pay and fringe benefits. The said contributions shall be remitted on or before the tenth (10th) day of each month.

(c)    The Trustees of the Club Employees Pension Fund shall have the right to request records from the Employer with respect to wages and employment, and shall have the right to examine said wage and employment records through duly authorized representatives, including certified public accountants.

(d)    The Union, in its name or the Club Employees Pension Fund, may institute an action or intervene in any proceedings at law, equity or bankruptcy, for the purpose of collecting any sums due the Pension Fund.

## ARTICLE XVI
## SCHOLARSHIP FUND

(a)    The Employer shall continue to contribute each month to the Hotel Trades Council and Hotel Industry Scholarship Fund (the "Scholarship Fund"), an amount equal to One Dollar ($1.00) to the Scholarship Fund for each employee covered by this Agreement. These contributions shall be used to provide higher education scholarship assistance for qualifying children of eligible employees. It is expressly understood and agreed that if, during the term of this Agreement, the above rate of monthly contribution to the Scholarship Fund shall be increased under the terms of the Industry-Wide Agreement, such increased rate shall automatically apply to the

Employer upon receipt of written notice from the Trustees of the Scholarship Fund. The said

contributions shall be remitted on or before the tenth (10th) day of each month.

(b)      The Employer hereby adopts and agrees to be bound, and to abide by, all of

the terms and conditions of the Scholarship Fund's Agreement and Declaration of Trust, including

the Audit Guidelines and Collection Procedures promulgated by the Trustees of the Scholarship

Fund pursuant thereto, and the Scholarship Fund's Summary Plan Description, as they each

presently exist or as they each may hereafter be amended or modified, and any interpretations of any

of the foregoing. The Scholarship Fund's Agreement and Declaration of Trust, Audit Guidelines

(c)      The Employer hereby agrees to execute any additional documents which may

be prescribed by the Trustees of the Scholarship Fund to effectuate and continue the Employer's

participation as a contributing employer with respect to such Fund.

6.      This Agreement is conditional upon and subject to ratification by the bargaining unit.

_____          _____
  Hotel, Restaurant & Club Employees and          The Players
Bartenders Union Local 6, HEREIU, AFL-
CIO



## SCHEDULE "B"

1.   Waiters performing service for 3-1/2 hours lunch function shall received $70.10.

2.   Waiters performing services for 4-1/2 hours dinner function shall received $104.00 up to twenty (20) covers as of July 1, 2001.

3.   If a waiter does not show up, the remaining waiters shall receive $6.00 per cover.

4.   Buffet covers will thirty (30) covers. Waiters setting up and clearing off shall receive an extra $16.00 per function. Setting up and clearing off shall consist of forty (40) covers.

5.   The normal amount for a dinner buffet will be thirty (30) covers. In the event that due to an increase in the function, or failure of waiters reporting for work, for each thirty (30) covers, the employer shall divide equally the proper amount of monies among the waiters servicing the function.

6.   When a party is scheduled for over one hundred (100) people the Club shall employ an extra dish washer whose pay shall be $61.50.

7.   Extra lunch bartenders shall be paid $56.50 for 3-1/2 hours function.

# MEMORANDUM OF AGREEMENT

Memorandum of Agreement made this ___ day of March 2007, by and between the Players (the "Club" or "Employer") and the Hotel, Restaurant & Club Employees and Bartenders Union Local 6, UNITE HERE (the "Union").

Except as modified below, the terms and conditions of the parties' Collective Bargaining Agreement dated February 1, 1989, as modified and extended by a Stipulation of Agreement dated August 17, 1992, and as further modified and extended by a Stipulation of Agreement dated February 10, 1997, and as further modified and extended by a Memorandum of Agreement dated October 1, 2001, shall continue.

1.    <u>Duration</u>  Delete Article XXVII, Section (a) and replace with:
The Agreement shall be effective as of July 1, 2006 and shall continue in full force and effect up to and including midnight June 20, 2011.

2.    <u>Retroactive Pay</u>  The wage increases provided for below shall be retroactive to July 1, 2006.

3.    <u>Wages</u>  Delete Article V and replace with below, and modify Schedule A accordingly:

(i)    All full-time employees shall receive weekly wage increases as follows:

| | |
|---|---|
| Effective and retroactive to July 1, 2006 | $22.50 |
| Effective July 1, 2007 | $22.50 |
| Effective July 1, 2008 | $22.50 |
| Effective July 1, 2009 | $22.50 |
| Effective July 1, 2010 | $22.50 |
| Effective July 1, 2011 | $22.50 |

(ii)    Part-time employees shall be paid weekly wage increases on a pro-rated basis based on the hours worked and according to the job classification rates provided for in Schedule A.

(iii)    Other wages and wage related items shall be increased by the same percentage as the above described increases to weekly wages.

4.    <u>Group Insurance</u>  Modify Article XIV as follows:

(i)    Replace Section (a) with:    The Employer shall continue to contribute each month to the New York Hotel Trades Council and Hotel Association of New York City, Inc. Health Benefits Fund (the "Health Benefits Fund") (the successor to the New York Hotel Trades Council and Hotel Association of New York City, Inc. Union Family Medical, Insurance and Dental Funds) a sum equal to twenty and one-half percent (20.5%) of the wages of each employee covered by this Agreement for coverage under the medical, insurance and dental benefits program portion of the Health Benefits Fund. The Employer shall remit its contributions on or before the tenth (10th) day of each month.



(ii)    Replace Section (f) with:    Effective and retroactive to July 1, 2006, the Employer shall increase its monthly contributions to the Health Benefits Fund to the sum of Three Dollars and Eighty Cents ($3.80) for each employee covered by this Agreement, to provide benefits under the optical benefits program of the Health Benefits Funds. Effective and retroactive to January 1, 2007, such contributions shall increase to the sum of Three Dollars and Ninety-Five Cents ($3.95). Said contributions shall be remitted on or before the tenth (10th) day of each month.

5.    Pensions  Add to end of Article XV, Section (b):

Effective July 1, 2007, the Employer shall increase its monthly contributions to the Club Employee Pension Fund to the sum equal to seven and one half percent (7.5%) of the wages paid to each employee under this Agreement.

6.    Sick Leave  Modify Article XVII, Section (a) as follows:

To increase sick days from six (6) to seven (7) days.

7.    Arbitration  Delete Article XXII and replace with:

In the event of any dispute or controversy of any nature whatsoever between the parties or with reference to the interpretation or application of this Agreement, the matter, question or dispute, shall be referred to a rotating panel of four (4) arbitrators, two (2) to be selected by the Union and two (2) by the Employer. The Union has selected arbitrators Ira Drogan and Elliot Shiftman, with the Employer selecting the remaining two (2). The decision of the arbitrator shall be final and binding on the parties hereto.

8.    Schedule "B"  Add to end:

(i)    Each waiter performing service on any lunch shift shall be guaranteed four and one half (4.5) hours of pay.

(ii)    Each waiter performing service on any dinner shift shall be guaranteed seven (7) hours of pay.

9.    This Agreement is conditional upon and subject to ratification by the Union.

_____
Hotel, Restaurant & Club Employees and
Bartenders Union Local 6, UNITE HERE.

_____
6-28-07
Date

_____
The Players

_____
6/7/07
Date